NORTHEAST MARINE TERMINAL CO., INC., ET AL. *v.*
CAPUTO ET AL.

No. 76–444.   Argued April 18, 1977—Decided June 17, 1977*

*Together with No. 76–454, *International Terminal Operating Co., Inc.* v. *Blundo et al.,* also on certiorari to the same court.

MARSHALL, J., delivered the opinion for a unanimous Court.

*William M. Kimball* argued the cause for petitioners in No. 76–444. With him on the brief was *Peter M. Pryor.* *E. Barrett Prettyman, Jr.,* argued the cause for petitioner in No. 76–454. With him on the briefs was *Robert J. Kenney, Jr.*

*Angelo C. Gucciardo* argued the cause and filed a brief for respondents Caputo and Blundo in both cases. *Frank H. Easterbrook* argued the cause for respondent Director, Office of Workers' Compensation Programs, in both cases *pro hac vice.* With him on the brief were *Acting Solicitor General Friedman, Laurie M. Streeter,* and *Joshua T. Gillelan II.*†

MR. JUSTICE MARSHALL delivered the opinion of the Court.

In 1972 Congress amended the Longshoremen's and Harbor Workers' Compensation Act (LHWCA or Act), 33 U. S. C. § 901 *et seq.,* in substantial part to "extend [the Act's] coverage to protect additional workers." S. Rep. No. 92–1125, p. 1 (1972) (hereinafter S. Rep.).[1] In these consolidated cases we must determine whether respondents Caputo and Blundo, injured while working on the New York City waterfront, are

---

†Briefs of *amici curiae* urging reversal were filed by *E. D. Vickery* and *W. Robins Brice* for the West Gulf Maritime Assn.; and by *Thomas D. Wilcox* for the National Association of Stevedores.

*Thomas W. Gleason* and *Herzl S. Eisenstadt* filed a brief for the International Longshoremen's Assn., AFL–CIO, as *amicus curiae* urging affirmance.

[1] 86 Stat. 1251, Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972 (hereinafter 1972 Amendments).

entitled to compensation. To answer that question we must determine the reach of the 1972 Amendments.

The sections of the Act relevant to these cases are the ones providing "coverage" and defining "employee." They provide, with italics to indicate the material added in 1972:

> "Compensation shall be payable . . . in respect of disability or death of an employee but only if the disability or death results from an injury occurring upon the navigable waters of the United States (*including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel*). . . ." 33 U. S. C. § 903 (a) (1970 ed., Supp. V).

> "The term 'employee' *means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker,* but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net." 33 U. S. C. § 902 (3) (1970 ed., Supp. V).

Specifically at issue here is whether respondents Caputo and Blundo were "employees" within the meaning of the Act and whether the injuries they sustained occurred on the "navigable waters of the United States."

## I

At the time of his injury respondent Carmelo Blundo had been employed for five years as a "checker" by petitioner International Terminal Operating Co. (ITO) at its facility in Brooklyn, N. Y., known as the 21st Street Pier. As a checker he was responsible for checking and recording cargo as it was

loaded onto or unloaded from vessels, barges, or containers.[2] Blundo was assigned his tasks at the beginning of each day and until he arrived at the terminal he did not know whether he would be working on a ship or on shore. He was reassigned during the day if he completed the task to which he was assigned initially. App. 63–69, 112.

On January 8, 1974, ITO assigned Blundo to check cargo being "stripped" or removed from a container on the 19th Street side of the pier. The container Blundo was checking had been taken off a vessel at another pier facility outside of Brooklyn and brought overland unopened by an independent trucking company to the 21st Street Pier. It was Blundo's job to break the seal that had been placed on the container in a foreign port and show it to United States Customs Agents. After the seal was broken, Blundo was to check the contents of the container against a manifest sheet describing the cargo, the consignees, and the ship on, and port from which, the cargo had been transported. He was to mark each item of cargo with an identifying number. After the checking, the cargo was to be placed on pallets, sorted according to consignees, and put in a bonded warehouse pending customs inspection. Blundo was injured as he was marking the cargo stripped from the container, when he slipped on some ice on the pier. *Id.*, at 69–74, 86–90.

Blundo sought compensation under the LHWCA. The Administrative Law Judge concluded that Blundo satisfied the

---

[2] A container is a large metal box resembling a truck trailer without wheels. It can carry large amounts of cargo destined for one or more consignees. If the goods are for a single consignee, the container may be removed from the pier intact and delivered directly to him, but if it carries goods destined for several consignees, it must be unloaded or "stripped" and the goods sorted according to consignee. This operation may be done at the waterfront or inland. The analogous process during the loading phase is called "stuffing." App. 86–89, 96–98, 101–103, 105–107; Brief for Federal Respondent 7 n. 4; Brief for National Association of Stevedores as *Amicus Curiae* 30.

coverage requirements of the Act and the Benefits Review
Board (BRB) affirmed.[3]

Respondent Ralph Caputo was a member of a regular
longshoring "gang" that worked for Pittston Stevedoring
Co.[4] When his gang was not needed, Caputo went to the

---

[3] Under the 1972 Amendments, contested compensation claims are heard
by an administrative law judge. 33 U. S. C. § 919 (d) (1970 ed., Supp. V).
Review is then available from the BRB, a three-member board appointed
by the Secretary of Labor. The BRB, created by the 1972 Amendments,
is empowered "to hear and determine appeals raising a substantial ques-
tion of law or fact taken by any party in interest from decisions with
respect to claims of employees under [the LHWCA]." 33 U. S. C.
§§ 921 (b)(1), (3) (1970 ed., Supp. V); see generally 20 CFR §§ 801–802
(1976). The decisions of the BRB are subject to review in the courts
of appeals. 33 U. S. C. § 921 (c) (1970 ed., Supp. V).

Prior to the 1972 Amendments, cases were heard in the first instance by
deputy commissioners and review was then available in the district courts.
33 U. S. C. § 921. There was no administrative review procedure for
LHWCA claims.

The Benefits Review Board Service (BRBS) is the unofficial reporter
of the Board's decisions. The BRB's decision in Blundo's case may be
found at 2 BRBS 376 (1975) as well as in App. to Pet. for Cert. in No.
76–454, p. 45a. The Administrative Law Judge's decision is reproduced
id., at 49a. A synopsis of it may be found at 1 BRBS 71 (ALJ) (1975).

[4] It is necessary, at this point, to introduce some terminology. "A steve-
dore or stevedore contractor is responsible for loading or unloading a
ship in port by contract with a shipowner, agent, or charter operator."
U. S. Dept. of Labor, Office of Workers' Compensation Programs Task
Force Report, Longshore and Harbor Workers' Compensation Program
103 (1976). "[A] marine terminal operator, who may own or lease the
terminal property, is responsible for the safe handling of the ship, the
delivery and receipt of the ship's cargo, and all movement and handling of
that cargo between the point-of-rest and any place on the marine terminal
property except to shipside." *Ibid.*

Typically, the work of getting the cargo on and off the ship is done by a
"gang" of longshoremen "distributed between the ship and the pier so
they can move cargo in an uninterrupted flow." *Id.*, at 104. A
member of the gang may be designated by the equipment he operates,
*e. g.*, a winchman or hustler operator, or by the area in which he works,

waterfront hiring hall, where he was hired by the day by other stevedoring companies or terminal operators with work available. He had been hired on some occasions by Northeast Stevedoring Co. to work as a member of a stevedore gang on ships at the 39th Street Pier in Brooklyn; on other occasions he had been hired by petitioner Northeast Marine Terminal Co., Inc. (Northeast), for work in its terminal operations at the same location. App. 8–10, 14–16.

On April 16, 1973, Caputo was hired by Northeast to work as a "terminal labor[er]." App. to Pet. for Cert. in No. 76–444, p. 48a; App. 8, 14. A terminal laborer may be assigned to load and unload containers, lighters,[5] barges, and trucks.[6] *Id.*, at 8; Brief for Petitioners in No. 76–444, p. 4. When he arrived at the terminal, Caputo was assigned, along with a checker and forklift driver, to help consignees' truckmen load their trucks with cargo that had been discharged from ships at Northeast's terminal.[7] Caputo was injured while rolling a dolly loaded with cheese into a consignee's truck. App. 27–40.

The Administrative Law Judge found that Caputo satisfied the requirements of the Act and awarded him compensation. The BRB affirmed.[8]

The employers in both cases filed petitions to review the

*e. g.,* holdman. A typical longshore gang ranges from 12 to 20 workers. Because ship arrivals are irregular, the demand for a gang varies from day to day. *Ibid.*

[5] A lighter is a closed barge. App. 8. See discussion n. 35, *infra.*

[6] It is not clear from the record whether loading vessels with "ships' stores" and laundry for the crew may be assigned to a terminal laborer or whether there is a separate classification called "ship laborer" for this. Compare App. 8, 24–25 with Brief for Federal Respondent 5 n. 3.

[7] It was stipulated that all the cargo handled at this terminal either was going on board a vessel or had come from one. App. 6.

[8] The BRB decision is reported at 3 BRBS 13 (1975). A synopsis of the Administrative Law Judge's decision appears at 2 BRBS 4 (ALJ) (1975). Both opinions may also be found in Pet. for Cert. in No. 76–444, pp. 47a, 51a.

decisions and the Court of Appeals for the Second Circuit consolidated the cases. After thorough consideration of the language, history, and purposes of the 1972 Amendments, the court held, one judge dissenting, that the injuries of both respondents were compensable under the LHWCA.[9] In view of the conflict over the coverage afforded by the 1972 Amendments,[10] we granted certiorari to consider both cases.[11] 429 U. S. 998 (1976). We affirm.

## II

Congress enacted the LHWCA in 1927, 44 Stat. 1424, after this Court had thwarted the efforts of the States and of Con-

[9] *Pittston Stevedoring Corp.* v. *Dellaventura,* 544 F. 2d 35 (CA2 1976).

[10] See *ibid.; Sea-Land Service, Inc.* v. *Director, Office of Workers' Compensation,* 540 F. 2d 629 (CA3 1976); *Jacksonville Shipyards, Inc.* v. *Perdue,* 539 F. 2d 533 (CA5 1976), cert. pending *sub nom. P. C. Pfeiffer Co.* v. *Ford,* No. 76–641, *Halter Marine Fabricators, Inc.* v. *Nulty,* No. 76–880, and *Director, Office of Workers' Compensation Programs* v. *Jacksonville Shipyards, Inc.,* No. 76–1166; *Stockman* v. *John T. Clark & Son of Boston, Inc.,* 539 F. 2d 264 (CA1 1976), cert. pending, No. 76–571; *I. T. O. Corp. of Baltimore* v. *BRB,* 542 F. 2d 903 (CA4 1976) (en banc), cert. pending *sub nom. Maritime Terminals, Inc.* v. *Brown,* No. 76–706, and *Adkins* v. *I. T. O. Corp. of Baltimore,* No. 76–730. For discussion of these cases, see n. 40, *infra.*

[11] The Court of Appeals questioned whether the Director of the Office of Workers' Compensation Programs (OWCP), the federal respondent here, was a proper party in the Court of Appeals. *Pittston Stevedoring Corp.* v. *Dellaventura, supra,* at 42 n. 5. (The OWCP was established by the Secretary of Labor and given the responsibility to administer several benefits programs, including the LHWCA. 20 CFR § 701.201 (1976).) It concluded that some federal participation was proper and did not reach the question whether the BRB should have been substituted for the Director. Petitioners named the Director rather than the BRB as a respondent in the Court of Appeals and neither party has raised any question in this Court concerning the identity of the federal respondent. This question is therefore not before us. The Department of Labor has recently promulgated a regulation making it clear that the Director of OWCP is the proper federal party in a case of this nature. 42 Fed. Reg. 16133 (Mar. 1977).

gress to provide compensation for maritime workers injured on navigable waters through state compensation programs. In 1917, the Court, in *Southern Pacific Co. v. Jensen*, 244 U. S. 205, held that the States were without power to extend a workmen's compensation remedy to longshoremen injured on the gangplank between a ship and a pier. The decision left longshoremen injured on the seaward side of a pier without a compensation remedy while longshoremen injured on the pier were protected by state compensation Acts. *State Industrial Comm'n v. Nordenholt Corp.*, 259 U. S. 263 (1922). Dissatisfied with the gap in coverage thus created, and recognizing that the amphibious nature of longshoremen's work made it desirable to have "one law to cover their whole employment, whether directly part of the process of loading or unloading a ship or not,", Congress sought to authorize States to apply their compensation statutes to injuries seaward of the *Jensen* line.[12] Its attempts to allow such uniform state systems, however, were struck down as unlawful delegations of congressional power. *Washington v. W. C. Dawson & Co.*, 264 U. S. 219 (1924); *Knickerbocker Ice Co. v. Stewart*, 253 U. S. 149 (1920). Finally, convinced that the only way to provide workmen's compensation for longshoremen and harborworkers

---

[12] H. R. Rep. No. 639, 67th Cong., 2d Sess., 2 (1922). More fully, the Report noted:

"It is easy to understand the reason why the representatives of the workmen ask for compensation under State laws. The longshoremen are no more peripatetic workmen than are the repair men. They do not leave the port in which they work; they do not go into different jurisdictions. They are part of the local labor force and are permanently subject to the same conditions as are other local workmen. The work of longshoremen is not all on ship. Much of it is on the wharves. They may be at one moment unloading a dray or a railroad car or moving articles from one point on the dock to another, the next actually engaged in the process of loading or unloading cargo. Their need for uniformity is one law to cover their whole employment, whether directly part of the process of loading or unloading a ship or not."

See also S. Rep. No. 139, 65th Cong., 1st Sess., 1 (1917).

injured on navigable waters was to enact a federal system, Congress, in 1927, passed the LHWCA.

The Act was, in a sense, a typical workmen's compensation system, compensating an employee for injuries "arising out of and in the course of employment."[13] But it was designed simply to be a gapfiller—to fill the void created by the inability of the States to remedy injuries on navigable waters. Thus, it provided coverage only for injuries occurring "upon the navigable waters of the United States" and permitted compensation awards only "if recovery . . . through workmen's compensation proceedings [could] not validly be provided by state law."[14]

---

[13] "Injury," "employee," and "employer" were defined in 33 U. S. C. §§ 902 (2), (3), (4):

"(2) The term 'injury' means accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury . . . .

"(3) The term 'employee' does not include a master or member of a crew of any vessel, nor any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.

"(4) The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any dry dock)."

[14] Title 33 U. S. C. § 903 defined the coverage provided by the Act:

"(a) Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any dry dock) and if recovery for the disability or death through workmen's compensation proceedings may not validly be provided by State law. No compensation shall be payable in respect of the disability or death of—

"(1) A master or member of a crew of any vessel, nor any person engaged by the master to load or unload or repair any small vessel under eighteen tons net; or

"(2) An officer or employee of the United States or any agency thereof or of any State or foreign government, or of any political subdivision thereof.

"(b) No compensation shall be payable if the injury was occasioned

Congress' initial apprehension of the difficulties inherent in the existence of two compensation systems for injuries sustained by amphibious workers proved to be well founded. The courts spent the next 45 years trying to ascertain the respective spheres of coverage of the state and federal systems. As two commentators described it, "the relationship between [LHWCA] and the otherwise applicable State Compensation Act [was] shrouded in impenetrable confusion." G. Gilmore & C. Black, Law of Admiralty 409 (2d ed. 1975) (Gilmore). It is unnecessary to examine in detail the Court's efforts to dispel the confusion.[15] Suffice it to say that while the Court permitted recovery under state remedies in particular situations seaward of the *Jensen* line, see, *e. g., Davis* v. *Washington Labor Dept.*, 317 U. S. 249 (1942), the Court made it clear that federal coverage stopped at the water's edge. *Nacirema Operating Co.* v. *Johnson*, 396 U. S. 212 (1969).

In *Nacirema Operating Co., supra,* the Court held that the Act did not cover longshoremen killed or injured on a pier while attaching cargo to ships' cranes for loading onto the ships, even though coverage might have existed had the men been hurled into the water by the accident, *Marine Stevedoring Corp.* v. *Oosting,* 238 F. Supp. 78 (ED Va. 1965), aff'd, 398 F. 2d 900 (CA4 1968) (en banc),[16] or been injured on the

solely by the intoxication of the employee or by the willful intention of the employee to injure or kill himself or another."

[15] For discussion of the history, see *Victory Carriers, Inc.* v. *Law,* 404 U. S. 202, 204–209 (1971); *Nacirema Operating Co.* v. *Johnson,* 396 U. S. 212, 216–224 (1969); Gilmore 417–423; 4 A. Larson, Law of Workmen's Compensation § 89 (1976); Note, Broadened Coverage Under the LHWCA, 33 La. L. Rev. 683 (1973).

[16] *Nacirema Operating Co., supra,* reversed the en banc decision of the Fourth Circuit in *Marine Stevedoring Corp.* That decision involved four separate cases in which longshoremen had been injured in different incidents while engaged in loading cargo vessels. The Deputy Commissioner awarded compensation to the man hurled into the water by his accident; the others were found to be outside the Act's coverage. The Court of Appeals found that all four should be compensated. No

deck of the ship while performing part of the same operation, *Calbeck* v. *Travelers Ins. Co.*, 370 U. S. 114 (1962). The dissent protested the incongruity and unfairness of having coverage determined by "where the body falls" and argued that the Act was "status oriented, reaching all injuries sustained by longshoremen in the course of their employment." 396 U. S. at 224 (Douglas, J., dissenting). The majority, however, did not agree.

> "There is much to be said for uniform treatment of longshoremen injured while loading or unloading a ship. But even construing the [Extension of Admiralty Jurisdiction Act of 1948, 46 U. S. C. § 740,] to amend the Longshoremen's Act would not effect this result, since longshoremen injured on a pier by pier-based equipment would still remain outside the Act. And construing the Longshoremen's Act to coincide with the limits of admiralty jurisdiction—whatever they may be and however they may change—simply replaces one line with another whose uncertain contours can only perpetuate on the landward side of the *Jensen* line, the same confusion that previously existed on the seaward side. While we have no doubt that Congress had the power to choose either of these paths in defining the coverage of its compensation remedy, the plain fact is that it chose instead the line in *Jensen* separating water from land at the edge of the pier. The invitation to move that line landward must be addressed to Congress, not to this Court." *Id.,* at 223–224." [17]

In 1972, Congress moved the line.

---

petition for certiorari was sought in the case involving the worker who fell in the water and thus this Court did not have that question before it.

[17] The Court reiterated its suggestion to Congress in *Victory Carriers, Inc.* v. *Law, supra,* which held that a longshoreman injured on the pier by a pier-based forklift could not recover from the shipowner under a warranty of seaworthiness. The Court noted the sturdiness of the

The 1972 Amendments were the first significant effort to reform the 1927 Act and the judicial gloss that had been attached to it. The main concern of the 1972 Amendments was not with the scope of coverage but with accommodating the desires of three interested groups: (1) shipowners who were discontented with the decisions allowing many maritime workers to use the doctrine of "seaworthiness" to recover full damages from shipowners regardless of fault; (2) employers of the longshoremen who, under another judicially created doctrine, could be required to indemnify shipowners and thereby lose the benefit of the intended exclusivity of the compensation remedy; and (3) workers who wanted to improve the benefit schedule deemed inadequate by all parties.[18] Congress sought to meet these desires by "specifi-

---

*Jensen* line in the absence of statutory modification. It observed, however, that "if denying federal remedies to longshoremen injured on land is intolerable Congress has ample power under Arts. I and III of the Constitution to enact a suitable solution." 404 U. S., at 216.

[18] The Report of the Senate Committee on Labor and Public Welfare described the need for the bill:

"The Longshoremen's and Harbor Workers' Compensation Act was last amended in 1961, at which time the maximum benefit under the Act was set at $70 per week. . . . Clearly, in order to provide adequate income replacement for disabled workers covered under this law a substantial increase in benefits is urgently required.

.            .            .            .

"While every one has agreed since at least the mid-1960's that the benefits under this Act should be raised, there has been some dispute over the years as to whether such benefits should be raised so long as this compensation law was not the exclusive remedy for an injured worker. It has been the feeling of most employers that while they were willing to guarantee payment to an injured worker regardless of fault, they would only do so if the right to such payment was the exclusive remedy and they would not be subject to additional law suits because of that injury.

"Since 1946, due to a number of decisions by the U. S. Supreme Court [starting with *Seas Shipping Co.* v. *Sieracki*, 328 U. S. 85 (1946)], it has been possible for an injured longshoreman to avail himself of the benefits of the Longshoremen's and Harbor Workers' Compensation Act and to sue

cally eliminating suits against vessels brought for injuries to longshoremen under the doctrine of seaworthiness and outlawing indemnification actions and 'hold harmless' or indemnity agreements[; continuing] to allow suits against vessels or other third parties for negligence[; and raising] benefits to a level commensurate with present day salaries and with the needs of injured workers whose sole support will be payments under the Act." S. Rep. 5.[19]

In increasing the benefits, however, Congress recognized that the disparity between the federal compensation rates and the significantly lower state rates would exacerbate the harshness of the already unpopular *Jensen* line. It also realized that modern technology had moved much of the longshoreman's work onto the land so that if coverage were not extended, there would be many workers who would be relegated to what Congress deemed clearly inadequate state compensation systems. As both the Senate and House Reports stated:

"[C]overage of the present Act stops at the water's edge;

---

the owner of the ship on which he was working for damages as a result of this injury. The Supreme Court has ruled that such ship owner, under the doctrine of seaworthiness, was liable for damages caused by any injury regardless of fault. In addition, [under the ruling of *Ryan Stevedoring Co.* v. *Pan-Atlantic S. S. Corp.*, 350 U. S. 124 (1956),] shipping companies generally have succeeded in recovering the damages for which they are held liable to injured longshoremen from the stevedore on theories of express or implied warranty, thereby transferring their liability to the stevedore company, the actual employer of the longshoremen." S. Rep. 4.

"The end result is that, despite the provision in the Act which limits an employer's liability to the compensation and medical benefits provided in the Act, a stevedore-employer is indirectly liable for damages to an injured longshoreman who utilizes the technique of suing the vessel under the unseaworthiness doctrine." *Id.*, at 9.

"The social costs of these law suits, the delays, crowding of court calendars and the need to pay for lawyers' services have seldom resulted in a real increase in actual benefits for injured workers." *Id.*, at 4.

[19] See Pub. L. 92–576, §§ 5–11, 18, 86 Stat. 1253.

injuries occurring on land are covered by State Work-
men's Compensation laws. The result is a disparity in
benefits payable for death or disability for the same type
of injury depending on which side of the water's edge and
in which State the accident occurs.

"To make matters worse, most State Workmen's Com-
pensation laws provide benefits which are inadequate . . . .

.        .        .        .        .

"It is apparent that if the Federal benefit structure
embodied in [the] Committee bill is enacted, there would
be a substantial disparity in benefits payable to a perma-
nently disabled longshoreman, depending on which side
of the water's edge the accident occurred, if State laws
are permitted to continue to apply to injuries occurring
on land. It is also to be noted that with the advent of
modern cargo-handling techniques, such as containeriza-
tion and the use of LASH-type vessels, more of the
longshoreman's work is performed on land than
heretofore." [20]

To remedy these problems, Congress extended the coverage
shoreward. It broadened the definition of "navigable waters
of the United States" to include "any adjoining pier, wharf,
dry dock, terminal, building way, marine railway, or other
adjoining area customarily used by an employer in loading,
unloading, repairing, or building a vessel." [21] At the same
time, Congress amended the definition of the persons covered

---

[20] S. Rep. 12–13. This appears in the section of the report called
Extension of Coverage to Shoreside Areas. The House Report, H. R.
Rep. No. 92–1441, pp. 10–11 (1972) (hereinafter H. R. Rep.) contains the
identical section.

[21] 33 U. S. C. § 903 (1970 ed., Supp. V). Congress also removed the
provision that precluded federal recovery if a state workmen's compensa-
tion remedy were available. It retained the exclusions contained in 33
U. S. C. §§ 903 (a) (1), (a) (2), and (b). See n. 14, *supra*.

by the Act. Previously, so long as a work-related injury occurred on navigable waters and the injured worker was not a member of a narrowly defined class,[22] the worker would be eligible for federal compensation provided that his or her employer had at least one employee engaged in maritime employment. It was not necessary that the injured employee be so employed. *Pennsylvania R. Co. v. O'Rourke,* 344 U. S. 334, 340–342 (1953). But with the definition of "navigable waters" expanded by the 1972 Amendments to include such a large geographical area, it became necessary to describe affirmatively the class of workers Congress desired to compensate. It therefore added the requirement that the injured worker be "engaged in maritime employment," which it defined to include "any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but . . . not . . . a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net." 33 U. S. C. § 902 (3) (1970 ed., Supp. V).[23]

The 1972 Amendments thus changed what had been essen-

---

[22] The definition of "employee" excluded "a master or member of a crew of any vessel, [and] any person engaged by the master to load or unload or repair any small vessel under eighteen tons net." 33 U. S. C. § 902 (3). In addition, the coverage section, § 903, provided that no compensation was payable in respect of the disability or death of an employee of the United States. See n. 14, *supra.* These exclusions have been retained by the 1972 Amendments, see n. 21, *supra.*

[23] The definition of "employer" was changed so as to correspond with the broadened definition of navigable waters. Title 33 U. S. C. § 902 (4) (1970 ed., Supp. V) reads:

"The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)."

tially only a "situs" test of eligibility for compensation to one looking to both the "situs" of the injury and the "status" of the injured. We must now determine whether respondents Caputo and Blundo satisfied these requirements.

## III

We turn first to the question whether Caputo and Blundo satisfied the "status" test—that is, whether they were "engaged in maritime employment" and therefore "employees" at the time of their injuries.[24] The question is made difficult by the failure of Congress to define the relevant terms— "maritime employment," "longshoremen," "longshoring operations"[25]—in either the text of the Act or its legislative history.[26]

---

[24] There is no question in these cases that the injuries "arose out of and in the course of employment" and that the employers are statutory employers. See App. to Pet. for Cert. in No. 76–454, pp. 53a–54a; App. to Pet. for Cert. in No. 76–444, pp. 52a–53a; Brief for Petitioners in No. 76–444, p. 3.

[25] As the definition of "employee" makes clear, the category of persons engaged in maritime employment includes more than longshoremen and persons engaged in longshoring operations. It is, however, unnecessary in this case to look beyond these two subcategories.

This case also does not involve the question whether Congress excluded people who would have been covered before the 1972 Amendments; that is, workers who are injured on navigable waters as previously defined. See *Weyerhaeuser Co.* v. *Gilmore,* 528 F. 2d 957 (CA9), cert. denied, 429 U. S. 868 (1976).

[26] The Reports and discussions used only the terms of the statute without elaboration. Thus, for example, the Section-by-Section Analysis in the Senate Report states:

"Section 2(a) amends section 2(3) of the Act to define an 'employee' as any person engaged in maritime employment. The definition specifically includes any longshoreman or other person engaged in longshoreing [*sic*] operations, and any harborworker, including a ship repairman, shipbuilder and shipbreaker. It does not exclude other employees traditionally covered but retains that part of 2(3) which excludes from the definition of 'employee' masters, crew members or persons engaged by the master to

The closest Congress came to defining the key terms is the "typical example" of shoreward coverage provided in the Committee Reports.[27] The example clearly indicates an

---

unload, load or repair vessels of less than eighteen tons net." S. Rep. 16. See also H. R. Rep. 14.

And in the section describing the shoreward extension, the Committee Reports state:

"The Committee believes that the compensation payable to a longshoreman or a ship repairman or builder should not depend on the fortuitous circumstance of whether the injury occurred on land or over water. Accordingly, the bill would amend the Act to provide coverage of longshoremen, harbor workers, ship repairmen, ship builders, shipbreakers, and other employees engaged in maritime employment (excluding masters and members of the crew of a vessel) if the injury occurred either upon the navigable waters of the United States or any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other area adjoining such navigable waters customarily used by an employer in loading, unloading, repairing, or building a vessel" S. Rep. 13; H. R. Rep. 10.

[27] "The intent of the Committee is to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity. To take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity. Thus, employees whose responsibility is only to pick up stored cargo for further trans-shipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo. However, checkers, for example, who are directly involved in the loading or unloading functions are covered by the new amendment. Likewise the Committee has no intention of extending coverage under the Act to individuals who are not employed by a person who is an employer, i. e., a person at least some of whose employees are engaged, in whole or in part in some form of maritime employment. Thus, an individual employed by a person none of whose employees work, in whole or in part, on navigable waters, is not covered even if injured on a pier adjoining navigable waters." S. Rep. 13; H. R. Rep. 10–11.

intent to cover those workers involved in the essential elements of unloading a vessel—taking cargo out of the hold, moving it away from the ship's side, and carrying it immediately to a storage or holding area. The example also makes it clear that persons who are on the situs but are not engaged in the overall process of loading and unloading vessels are not covered. Thus, employees such as truckdrivers, whose responsibility on the waterfront is essentially to pick up or deliver cargo unloaded from or destined for maritime transportation are not covered. Also excluded are employees who perform purely clerical tasks and are not engaged in the handling of cargo. But while the example is useful for identifying the outer bounds of who is clearly excluded and who is clearly included, it does not speak to all situations.[28] In particular, it is silent on the question of coverage for those people, such as Caputo and Blundo, who are injured while on the situs, see Part IV, *infra,* and engaged in the handling of cargo as it moves between sea and land transportation after its immediate unloading.[29]

---

[28] That the example is not exhaustive is clear. Some types of cargo, for example, are never brought to a "holding or storage area" but are placed directly on a truck or railroad car for immediate inland movement. See Brief for Petitioner in No. 76–454, p. 38 n. 46; Tr. of Oral Arg. 44. And, while all would agree that persons bringing such cargo directly from a ship to a truck are engaged in maritime employment, see *infra,* at 274–275, the example does not mention such activity. In addition, while it is incontrovertible that workers engaged in the process of loading a ship and performing steps analogous to those mentioned in the example—that is, moving cargo from storage and placing it immediately on the ship—are covered, the fact is that the example also does not mention these steps. See also discussion, n. 38, *infra.*

[29] Accord, *Pittston Stevedoring Corp.* v. *Dellaventura,* 544 F. 2d, at 54; *Jacksonville Shipyards, Inc.* v. *Perdue,* 539 F. 2d, at 540. The First Circuit in fact accused Congress of "seemingly [going] out of its way to avoid taking any express stance on the status of those engaged in stuffing and stripping containers as part of the loading and unloading process just as it is silent on the status of other terminal employees engaged in moving,

Nevertheless, we are not without guidance in resolving that question. The language of the 1972 Amendments is broad and suggests that we should take an expansive view of the extended coverage. Indeed, such a construction is appropriate for this remedial legislation. The Act "must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results." *Voris* v. *Eikel,* 346 U. S. 328, 333 (1953). Consideration of the purposes behind the broadened coverage reveals a clear intent to reach persons such as Blundo and Caputo.[30]

storing and culling cargo on the pier." *Stockman* v. *John T. Clark & Son of Boston, Inc.,* 539 F. 2d, at 274.

[30] We find consideration of the purposes more enlightening than looking simply at whether respondents belong to the International Longshoremen's Association. See Brief for ILA as *Amicus Curiae* 15. We cannot assume that Congress intended to make union membership the decisive factor. The vagaries of union jurisdiction are unrelated to the purposes of the Act. *Pittston Stevedoring Corp., supra,* at 52; *Stockman, supra,* at 272; *Jacksonville Shipyards, Inc., supra,* at 543–544; but cf. *Weyerhaeuser Co.* v. *Gilmore,* 528 F. 2d, at 962.

The private respondents suggest, Brief for Respondents Caputo et al. 19–21, that Congress intended to use the definitions found in the Bi-State Compact between New York and New Jersey that created the Bi-State Waterfront Commission, and was approved by Congress, 67 Stat. 541. The definitions may be found in N. Y. Unconsol. Laws §§ 9806, 9905 (McKinney 1974). Section 9806 provides, in relevant part:

" 'Pier' shall include any wharf, pier, dock or quay.

" 'Other waterfront terminal' shall include any warehouse, depot or other terminal (other than a pier) which is located within one thousand yards of any pier in the port of New York district and which is used for waterborne freight in whole or substantial part.

. . . . .

" 'Longshoreman' shall mean a natural person, other than a hiring agent, who is employed for work at a pier or other waterfront terminal, either by a carrier of freight by water or by a stevedore

"(a) physically to move waterborne freight on vessels berthed at piers, on piers or at other waterfront terminals, or

"(b) to engage in direct and immediate checking of any such freight or of the custodial accounting therefor or in the recording or tabulation of

One of the primary motivations for Congress' decision to extend the coverage shoreward was the recognition that "the advent of modern cargo-handling techniques" had moved

the hours worked at piers or other waterfront terminals by natural persons employed by carriers of freight by water or stevedores, or

"(c) to supervise directly and immediately others who are employed as in subdivision (a) of this definition."

Section 9905 provides supplementary definitions:

"(6) 'Longshoreman' shall also include a natural person, other than a hiring agent, who is employed for work at a pier or other waterfront terminal

"(a) either by a carrier of freight by water or by a stevedore physically to perform labor or services incidental to the movement of waterborne freight on vessels berthed at piers, on piers or at other waterfront terminals, including, but not limited to, cargo repairmen, coopers, general maintenance men, mechanical and miscellaneous workers, horse and cattle fitters, grain ceilers and marine carpenters, or

"(b) by any person physically to move waterborne freight to or from a barge, lighter or railroad car for transfer to or from a vessel of a carrier of freight by water which is, shall be, or shall have been berthed at the same pier or other waterfront terminal, or

"(c) by any person to perform labor or services involving, or incidental to, the movement of freight at a waterfront terminal as defined in subdivision (10) of this section.

.        .        .        .        .

"(10) 'Other waterfront terminal' shall also include any warehouse, depot or other terminal (other than a pier), whether enclosed or open, which is located in a marine terminal in the port of New York district and any part of which is used by any person to perform labor or services involving, or incidental to, the movement of waterborne freight or freight.

"As used in this section, 'marine terminal' means an area which includes piers, which is used primarily for the moving, warehousing, distributing or packing of waterborne freight or freight to or from such piers, and which, inclusive of such piers, is under common ownership or control."

While we find these definitions useful indicators of the terminology used by the industry, we agree with the court below that to assume, absent any indication in the legislative history, that Congress in 1972 had in mind this action of the 1953 Congress is "to attribute a degree of acumen few Congressmen would claim." 544 F. 2d, at 50.

much of the longshoreman's work off the vessel and onto land. S. Rep. 13; H. R. Rep. 10. Noted specifically was the impact of containerization. Unlike traditional break-bulk cargo handling, in which each item of cargo must be handled separately and stored individually in the hold of the ship as it waits in port, containerization permits the time-consuming work of stowage and unstowage to be performed on land in the absence of the vessel. The use of containerized ships has reduced the costly time the vessel must be in port and the amount of manpower required to get the cargo onto the vessel.[31] In effect, the operation of loading and unloading has been moved shoreward; the container is a modern substitute for the hold of the vessel. As Judge Friendly observed below, "[s]tripping a container . . . is the functional equivalent of sorting cargo discharged from a ship; stuffing a container is part of the loading of the ship even though it is performed on

[31] "[T]he greatest economies promised by containerization are found in the efficiency of using a specially fitted all-container ship. A most important part of the costs of running a vessel is the dead time in port while loading and unloading. A ship in port earns no income and its heavy fixed costs continue. Moreover, the fast turnaround time of container ships—a container ship can unload and reload in 36–48 hours compared to the seven or eight days required for conventional ships—substantially cuts the number of ships needed to handle any given volume of cargo. . . . .

"Labor productivity is astonishingly increased by containerization. One major shipping company reported that each of its work gangs on a conventional ship produced an average of 15 tons per hour compared with 300 tons an hour worked by one gang at a container ship hatch. More generally, the industry considers that 'it would take 126 men 84 hours each, or a total of 10,584 man-hours, to discharge and load about 11,000 tons of cargo aboard a conventional ship. The same amount of cargo on a container vessel can be handled by 42 men working 13 hours each or a total of 546 man hours.'" Ross, Waterfront Labor Response to Technological Change: A Tale of Two Unions, 21 Labor L. J. 397, 399–400 (1970).

See Goldberg, Containerization as a Force for Change on the Waterfront, 91 Monthly Labor Rev. 8, 9 (1968).

shore and not in the ship's cargo holds." *Pittston Stevedoring Corp.* v. *Dellaventura,* 544 F. 2d 35, 53 (CA2 1976). Congress' intent to adapt the LHWCA to modern cargo-handling techniques clearly indicates that these tasks, heretofore done on board ship, are included in the category of "longshoring operations." [32]

It is therefore apparent that respondent Blundo was a statutory "employee" when he slipped on the ice. His job was to check and mark items of cargo as they were unloaded from a container. This task is clearly an integral part of the unloading process as altered by the advent of containerization and was intended to be reached by the Amendments. Indeed, the Committee Reports explicitly state: "[C]heckers, for example, who are directly involved in the loading or unloading functions are covered by the new amendment." S. Rep. 13; H. R. Rep. 11. We thus have no doubt that Blundo satisfied the status test.[33]

The congressional desire to accommodate the Act to modern technological changes is not relevant to Caputo's case, since

---

[32] Accord, *Pittston Stevedoring Corp.,* 544 F. 2d, at 53; *I. T. O. Corp. of Baltimore,* 542 F. 2d, at 905; *Stockman,* 539 F. 2d, at 275–277. As one commentator observed:

"The work of the longshoreman, the loading and unloading of cargo, remains the same; only the procedure and the place of performance [have] changed. It seems unlikely that Congress would acknowledge that long-shoring today involves more shore-based activity than formerly and then extend coverage only to those longshoremen working closest to the ship." Comment, Maritime Law—LHWCA Recovery Denied Longshoremen Injured Landward of the "Point of Rest," 10 Suffolk U. L. Rev. 1179, 1188 (1976).

[33] We find no significance in the fact that the container Blundo was stripping had been taken off a vessel at another pier and then moved to the site of the injury. Until the container was stripped, the unloading process was clearly incomplete. The only geographical concern Congress exhibited was that the operation take place at a covered situs. See Part IV, *infra.* It was precisely Congress' intent to accommodate the mobility of containers and the ability to transport and strip them at locations removed from the ship.

he was injured in the old-fashioned process of putting goods already unloaded from a ship or container into a delivery truck. Another dominant theme underlying the 1972 Amendments, however, assists us in analyzing Caputo's status. Congress wanted a "uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity." S. Rep. 13; H. R. Rep. 10–11. It wanted a system that did not depend on the "fortuitous circumstance of whether the injury [to the longshoreman] occurred on land or over water." S. Rep. 13; H. R. Rep. 10. It therefore extended the situs to encompass the waterfront areas where the overall loading and unloading process occurs. It is the view of the respondent Director of the OWCP that a uniform system must reach "all physical cargo handling activity anywhere within an area meeting the situs [test]." Brief for Federal Respondent 20. "[M]aritime employment," in his view, "include[s] all physical tasks performed on the waterfront, and particularly those tasks necessary to transfer cargo between land and water transportation." *Id.*, at 25. Under this theory, it is clear that the Act would cover someone who, like Caputo, was engaged in the final steps of moving cargo from maritime to land transportation: putting it in the consignee's truck.

We need not decide, however, whether the congressional desire for uniformity supports the Director's view [34] and enti-

---

[34] While the Director identifies this as the BRB's position as well as his own, Brief for Federal Respondent 20, it appears to us that the BRB has gone further than this position suggests. For example, the BRB found that a clerk, who worked in an office processing the paperwork for the delivery of cargo to truckmen for removal from the terminal, was a covered "employee." It reasoned that this function, although clerical in nature, was "essential to the removal of cargo from the terminal and was an integral part of longshoring operations." *Farrell* v. *Maher Terminals, Inc.*, 3 BRBS 42, 45 (1975). Contrary to the view expressed by the Director, the BRB showed no concern with the fact that the employee did not handle cargo. Citing the Committee Reports, see n. 27,

tles everyone performing a task such as Caputo's to benefits under the Act. It is clear, at a minimum, that when someone like Caputo performs such a task, he is to be covered. The Act focuses primarily on occupations—longshoreman, harbor worker, ship repairman, shipbuilder, shipbreaker. Both the text and the history demonstrate a desire to provide continuous coverage throughout their employment to these amphibious workers who, without the 1972 Amendments, would be covered only for part of their activity. It seems clear, therefore, that when Congress said it wanted to cover "longshoremen," it had in mind persons whose employment is such that they spend at least some of their time in indisputably longshoring operations and who, without the 1972 Amendments, would be covered for only part of their activity.

That Caputo is such a person is readily apparent. As a member of a regular stevedoring gang, he participated on either the pier or the ship in the stowage and unloading of cargo. On the day of his injury he had been hired by petitioner Northeast as a terminal laborer. In that capacity, he could have been assigned to any one of a number of tasks necessary to the transfer of cargo between land and maritime transportation, including stuffing and stripping containers, loading and discharging lighters and barges,[35] and loading and unloading

*supra*, the Third Circuit has rejected this conclusion and granted a petition for review. *Maher Terminals, Inc.* v. *Farrell*, 548 F. 2d 476, 478 (1977).

Regardless of whether the view advanced by the Director is the position of the BRB, we agree with Judge Friendly that it would be useful for the BRB to engage in an extensive study of the structure of work on the various piers of the country. While the record before us contains sufficient information to enable us to decide the present cases, such a study will be helpful for future cases.

[35] Lighters and barges are part of the modern technological advancements to which Congress referred when it mentioned "LASH-type vessels." The term LASH is an acronym for "lighter aboard ship." The National Association of Stevedores (NAS) describes the system as follows:

"[C]argo is placed in special uniform size 'lighters,' or barges, which are

trucks. App. 8. Not only did he have no idea when he set out in the morning which of these tasks he might be assigned, but in fact his assignment could have changed during the day. Thus, had Caputo avoided injury and completed loading the consignee's truck on the day of the accident, he then could have been assigned to unload a lighter. *Id.*, at 24. Since it is clear that he would have been covered while unloading such a vessel,[36] to exclude him from the Act's coverage in the morning but include him in the afternoon would be to revitalize the shifting and fortuitous coverage that Congress intended to eliminate.

Petitioners and the NAS seek to avoid these results by proposing a so-called "point of rest" theory.[37] The term "point of rest" is claimed to be a term of art in the industry

---

called LASH barges to differentiate them from river barges. The LASH barges are towed from the loading port to the location of the LASH vessel, which is sometimes called the mother ship. The barges are mechanically loaded by a crane on the mother ship and are stacked in specially constructed holds in the mother ship. The actual stowage or unstowage of the barges with their contents in the mother ship requires substantially fewer longshoremen than does the loading of cargo into a breakbulk type ship. A very similar type of operation called SEABEE differs from the LASH operation described only in the size of the barge and the mechanical means for loading or unloading the barge onto or from the mother SEABEE ship.

"The actual loading of the barges is performed by longshoremen in precisely the same manner traditionally employed in the loading or unloading of a breakbulk ship. However, in most instances the size of the longshore gang involved in LASH and SEABEE operations is smaller than the regular ship's gang primarily because of the smaller size of the barge. The barges are in fact vessels and ply the navigable waters of the United States and may be loaded or unloaded at any inland or coastal waterfront facility." Brief for NAS as *Amicus Curiae* 27–28.

[36] The NAS specifically agrees:

"Workers who actually load or unload the barges are engaged in traditional longshore operations and if injured while so engaged would obviously be entitled to the benefits of the LHWCA unless their employer were a state, municipal or other public political entity." *Id.*, at 28.

[37] Petitioner Northeast also argues that the particular cargo Caputo was handling at the moment of injury was no longer in "maritime com-

that denotes the point where the stevedoring operation ends (or, in the case of loading, begins) and the terminal operation function begins (or ends, in the case of loading). Brief for Petitioner in No. 76–454, p. 9. See n. 4, *supra.* Petitioners contend that the "maritime employment of longshoremen" includes only "the stevedoring activity of the longshore gang (and those directly involved with the gang) which, in the case of unloading, takes cargo out of the hold of the vessel, moves it away from the ship's side, and carries it to its point of rest on the pier or in a terminal shed." Brief for Petitioner in No. 74–454, p. 9. Since Caputo and Blundo were handling cargo that had already reached its first point of rest, petitioners argue they are not to be covered.

This contention that Congress intended to use the point of rest as the decisive factor in the "status" determination has several fatal weaknesses. First, the term "point of rest" nowhere appears in the Act or in the legislative history. It is difficult to understand why, if Congress intended to stop coverage at this point, it never used the term. The absence of a term that is claimed to be so well known in the industry is both conspicuous and telling.

But it is not simply the term's unexplained absence that undermines petitioners' theory. More fundamentally, the

---

merce" because it had been at least five days since it had been taken off a ship. See the Administrative Law Judge's decision in App. to Pet. for Cert. in No. 76–444, p. 52a. But the consignee's delay in picking up the cargo has no effect on the character of the work required to effectuate the transfer of the cargo to the consignee. The work performed by the longshoreman is the same whether performed the day the cargo arrives in port or weeks later.

In addition, we reiterate that Caputo did not fall within the excluded category of employees "whose responsibility is only to pick up stored cargo for further trans-shipment." S. Rep. 13; H. R. Rep. 11. As we indicated, *supra,* at 266–267, that exclusion pertains to workers, such as the consignees' truckdrivers Caputo was helping, whose presence at the pier or terminal is for the purpose of picking up cargo for further shipment by land transportation.

theory is simply too restrictive, failing to accommodate either the language or the intent of the 1972 Amendments. The operations petitioners would cover clearly are "longshoring operations" and are appropriately covered by the Act. But petitioners fail to give effect to the obvious desire to cover longshoremen whether or not their particular task at the moment of injury is clearly a "longshoring operation." The theory does not comport with the Act's focus on occupations and its desire for uniformity. As the First Circuit noted: "The evil of the old Act was that it bifurcated coverage for essentially the same employment. The point-of-rest approach would seem to result in the same sort of bifurcation, since the same employee engaged in an activity beyond the point of rest would cease to be covered." *Stockman* v. *John T. Clark & Son of Boston, Inc.,* 539 F. 2d 264, 275 (1976). In addition, the theory fails to accommodate the intent to cover those longshoring operations that modern technology had moved onto the land. Coverage that stops at the point of rest excludes those engaged in loading and unloading the modern functional equivalents of the hold of the ship. As we have indicated, Congress clearly intended to cover such operations.[38]

---

[38] Moreover, we are not convinced that the point-of-rest theory provides the workable definition that petitioners claim for it. The "point" varies from port to port and with different types of cargo. See the Stevedore and Marine Terminal Industry of the United States (unpublished survey by the NAS) (1974–1975); n. 28, *supra.* The point can be moved seaward or landward at the whim of the employer. Such characteristics make it inconsistent with the uniform system Congress sought to design. As Judge Craven observed, when a panel of the Fourth Circuit adopted the point-of-rest theory and refused to cover persons holding jobs similar to Caputo's and Blundo's:

"[Respondents] will, I think, be surprised to learn that they are not longshoremen, and astonished to discover that they are not engaged in maritime employment of any kind. If they are not, as my brothers hold, then the Congress has labored prodigiously only to have accomplished nothing at all in its effort to simplify the problems of maritime workers' compensation. . . . Henceforth, injured employees and their counsel must

The only support petitioners can find for their theory is the fact that it is consistent with the "typical example" given in the Committee Reports. See n. 27, *supra*. But as we have already indicated, *supra*, at 266–267, the example is equally consistent with a broader view of coverage. Consistency with an illustrative example is clearly not enough to overcome the overwhelming evidence against the theory.[39]

In view of all this, it is not surprising that the "point of rest" limitation has been rejected by all but one of the Circuits that have considered it[40] and by virtually all the com-

---

comb the waterfronts of this circuit, probing hopelessly, like Diogenes with his lantern, for that elusive 'point of rest' upon which coverage depends." *I. T. O. Corp. of Baltimore* v. *BRB*, 529 F. 2d 1080, 1089 (1975) (dissenting opinion), modified en banc, 542 F. 2d 903 (1976).

[39] Petitioners also contend that it is too expensive to extend coverage beyond the point of rest and that Congress did not intend to impose such expenses on the employers. Brief for Petitioner in No. 76–454, pp. 68–73. However, there is nothing in the legislative history to indicate what Congress anticipated the expanded coverage would cost.

[40] The Court of Appeals for the Second Circuit, in the case below, rejected the point-of-rest theory and awarded compensation to Blundo and Caputo for reasons similar to those upon which we rely. *Pittston Stevedoring Corp.* v. *Dellaventura*, 544 F. 2d 35 (1976). The First Circuit, as noted in n. 29, *supra*, has also found the point-of-rest theory incompatible with Congress' desire for uniformity. Also relying on factors similar to those we consider, the court concluded that the operations of stuffing and stripping containers were clearly longshoring operations and affirmed a compensation award to one so engaged. *Stockman*, 539 F. 2d, at 272–277.

The Third Circuit has extended coverage well beyond the point of rest. *Sea-Land Service, Inc.* v. *Director, Office of Workers' Compensation*, 540 F. 2d 629 (1976). Its analysis has differed from the other Circuits. It concluded that Congress meant to exercise its full constitutional authority and to "afford federal coverage to all those employees engaged in handling cargo after it has been delivered from another mode of transportation for the purpose of loading it aboard a vessel, and to all those employees engaged in discharging cargo from a vessel up to the time it has been delivered to a place where the next mode of transportation will pick it

mentators.[41] We too reject it. A theory that nowhere appears in the Act, that was never mentioned by Congress during the legislative process, that does not comport with

up." *Id.*, at 638. The Circuit appears to have essentially discarded the situs test, holding that only "[an] employment nexus (status) with maritime activity is [necessary]" and that the situs of the maritime employee at the time of injury is irrelevant. *Ibid.* See also *Sea-Land Service, Inc.* v. *Director, Office of Workers' Compensation Programs,* 552 F. 2d 985 (CA3 1977); *Maher Terminals, Inc.* v. *Farrell,* 548 F. 2d 476 (CA3 1977).

The Fifth Circuit also has rejected the point-of-rest theory, calling it a "hypertechnical construction." *Jacksonville Shipyards, Inc.* v. *Perdue,* 539 F. 2d, at 540. It affirmed compensation awards to a worker securing a vehicle to a railway car in preparation for its transportation inland and to a worker unloading bales of cotton from a wagon and stacking them in the warehouse to await future placement on a ship. The awards were affirmed because both people were involved in "an integral part of the ongoing process of moving cargo between land transportation and a ship." *Id.*, at 543–544.

The Fourth Circuit is the one Circuit that has considered the theory and not rejected it. *I. T. O. Corp. of Baltimore* v. *BRB,* 542 F. 2d 903 (1976) (en banc). But it has also not accepted it. While three of six judges sitting en banc accepted the theory, the fourth held that the Act covered certain cargo handling within the terminal shoreside of the point of rest. He found coverage for two workers situated similarly to Blundo, characterizing their activities as part of the overall loading and unloading function. *Id.*, at 905. He denied coverage to a worker in the same situation as Caputo. The other two judges of the en banc court would have covered all three workers since they were engaged in "handl[ing] ships' cargo." *I. T. O. Corp. of Baltimore* v. *BRB,* 529 F. 2d, at 1097 (Craven, J., dissenting).

[41] Only one of the commentators discussing the Act prior to the early cases even thought of the point of rest as a line of demarcation, but he makes no effort to explain why the term was never mentioned in the Act or history. Vickery, Some Impacts of the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 41 Ins. Counsel J. 63 (1974). Gilmore §§ 6–51, p. 427; Gorman, The Longshoremen's and Harbor Workers' Compensation Act—After the 1972 Amendments, 6 J. Mar. L. & Com. 1, 9–10 (1974); Note, The 1972 Amendments to Section 903 of the Longshoremen's and Harbor Workers' Act, 4 Rutgers Camden L. J. 404 (1973); Note, Maritime Jurisdiction and Longshoremen's

Congress' intent, and that restricts the coverage of a remedial Act designed to extend coverage is incapable of defeating our conclusion that Blundo and Caputo are "employees."

## IV

Having established that respondents Blundo and Caputo satisfied the "status" test for coverage under the Act, we consider now whether their injuries occurred on a covered "situs"—"the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing or building a vessel)."

There is no dispute with respect to Caputo. The truck he was helping to load was parked inside the terminal area. As petitioner Northeast correctly concedes, this situs "unquestionably met the requirements of § 3 (a) of the Act, . . . because the terminal adjoins navigable waters of the United States and parts of the terminal are used in loading and unloading ships." Brief for Petitioners in No. 76–444, p. 3 n. 1.

Blundo's injury was sustained while he was checking a container being stripped on a pier located within a facility known as the 21st Street Pier. The fenced-in facility was located on the water and ran between 19th and 21st Streets. It included

Remedies, 1973 Wash. U. L. Q. 649; Note, Broadened Coverage Under the LHWCA, 33 La. L. Rev. 683 (1973).

Those writing after the theory had been advanced in the courts have universally found it inadequate. 4 A. Larson, *supra,* n. 15, § 89.42; Note, Shoreside Coverage Under the Longshoremen's and Harbor Workers' Compensation Act, 18 B. C. Ind. & Com. L. Rev. 135 (1976); Comment, Maritime Law—LHWCA Recovery Denied Longshoremen Injured Landward of "Point of Rest," 10 Suffolk U. L. Rev. 1179 (1976); Note, Admiralty Law/Workmen's Compensation—On the Waterfront, 54 N. C. L. Rev. 925 (1976); Comment, The Longshoremen's and Harbor Workers' Compensation Act: Coverage After the 1972 Amendments, 55 Texas L. Rev. 99, 116–120 (1976).

two "finger-piers." The pier on the 21st Street end was used to berth ships for purposes of loading and unloading them. The one on the 19th Street end was used only for stripping and stuffing containers and storage. See the Administrative Law Judge's decision in Pet. for Cert. in No. 76–454, pp. 52a–53a. Blundo was working on this latter pier.

Petitioner ITO argues that Blundo was not on a covered situs because the 19th Street Pier was not "customarily used by an employer for loading [or] unloading . . . a vessel." The Court of Appeals labeled this argument "halfhearted" and dismissed it in a footnote. 544 F. 2d, at 51 n. 19. We agree that the argument does not merit extended discussion.

First, we agree with the court below that it is not at all clear that the phrase "customarily used" was intended to modify more than the immediately preceding phrase "other areas." We note that the sponsor of the bill in the House, Representative Daniels, described this section as "expand[ing] the coverage which was limited to the ship in the present law, to the piers, wharves, and terminals." 118 Cong. Rec. 36381 (1972). There was little concern with respect to how these facilities were used.[42]

---

[42] Petitioner ITO contends that statements in the Committee Reports indicate that the "customarily used" requirement is to apply to all the specified areas. It points to the Reports' intent to exclude persons not engaged in loading, unloading, repairing or building a vessel "just because they are injured in an area adjoining navigable waters used for such activity," S. Rep. 13; H. R. Rep. 11, and the Senate Report's description of the bill as "expand[ing] the coverage of this Act to cover injuries occurring in the contiguous dock area related to longshore and ship repair work." S. Rep. 2. These statements, however, serve to undermine rather than to help ITO's attempt to read the situs requirement to exclude the pier on which Blundo was working. Even assuming they suggest a usage requirement for all such adjoining piers, it is clear that the usage is broad enough to encompass stripping and stuffing containers, integral parts of the overall loading and unloading process.

Second, even if we assume that the phrase should be read to modify the preceding terms, we agree with the BRB and the Court of Appeals that Blundo satisfied the situs test in the same way that Caputo did—by working in an "adjoining . . . terminal . . . customarily used . . . in loading [and] unloading." The entire terminal facility adjoined the water and one of its two finger-piers clearly was used for loading and unloading vessels.

Accordingly, we conclude that when Congress sought to expand the situs to avoid anomalies inherent in a system that drew lines at the water's edge, it intended to include an area such as the one at issue here. Accord, *Stockman* v. *John T. Clark & Son of Boston, Inc.,* 539 F. 2d, at 271–272; *I. T. O. Corp. of Baltimore* v. *BRB,* 529 F. 2d 1080, 1083–1084 (CA4 1975), modified en banc, 542 F. 2d 903 (1976).

Since we find that both Caputo and Blundo satisfied the status and the situs tests, we affirm.

*It is so ordered.*