CARGILL, INC., and State Accident Insurance Fund, Petitioner,

v.

Kenneth E. POWELL, and Director, Office of Worker's Compensation Programs, Respondent.

No. 75–2655.

United States Court of Appeals, Ninth Circuit.

Nov. 17, 1977.

Rehearing and Rehearing En Banc Feb. 7, 1978.

Robert E. Babcock (argued), of Lindsay, Nahstoll, Hart, Dafoe & Krause, Portland, Ore., for appellant.

Joslua T. Gillelan, II (argued), of Dept. of Labor, Washington, D.C., Raymond J. Conboy (argued), Portland, Ore., for appellee.

Before LUMBARD*, WRIGHT and ANDERSON, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This petition for review is brought by Cargill, Inc., and its workers' compensation insurer, the State Accident Insurance Fund, pursuant to 33 U.S.C. § 921(c) of the Longshoremen's and Harbor Workers' Compensation Act [LHWCA], 33 U.S.C. § 901, et seq., seeking reversal of a decision of the Benefits Review Board. The Board's decision held that an injury suffered by Kenneth E. Powell in the course of his employment with Cargill was within the coverage of the LHWCA and thereby reversed the decision of the administrative law judge who had denied Powell's claim.[1]

In early 1973 Powell was hired from the union hall, jointly operated by Local 8 of the International Longshoremen's and Warehousemen's Union and the employers in the Port of Portland, to work for Cargill at its grain handling facilities at Terminal 4, a public dock facility owned by the Port and situated on the Willamette River. The longshoremen employed by Cargill were hired as "key men" which meant that they could perform any of the several tasks involved in the operation and maintenance of all grain handling equipment at the facility. Their work did not include work aboard the ships.

The employer, Cargill, Inc., is in the business of buying and selling grain, most of which is exported overseas. The grain purchased by Cargill is received at Terminal 4 by rail, truck and barge. Once received, the grain is unloaded and delivered by conveyor belts to Cargill's main elevator for weighing and then to bins where it is stored. When a ship is ready for loading the grain is conveyed again to the scales, and then to the ship. The actual distribution of grain into the ship's hold is done by independent stevedoring companies. If a ship was being loaded as grain was being received, the grain would be conveyed directly through the scales to the ship.

On the day of his injury, July 22, 1973, Powell had been continuously employed by Cargill for about seven months. During most of those seven months, and on the day of his injury, he worked as a "tipper" switchman. The "tipper" is a device used to assist in the unloading of railroad cars. The "tipper" would not accept certain railroad gondola cars and when such cars arrived, Powell would assist in the unloading of them. He injured his back while attempting to open one of the cars.

The sole issue before this court is whether Powell's claim is within the coverage of the LHWCA, as amended in 1972.

*Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977), goes a long way to defining to whom the LHWCA applies, but there remains a gray area where maritime activity blends into the nonmaritime. This case lies in that murky area.

In *Northeast Marine Terminal*, the Supreme Court was confronted with the question of coverage under the LHWCA of injuries sustained by two workmen, Carmelo Blundo and Ralph Caputo. On the day of his injury, Blundo was assigned as a "check-

* The Honorable J. Edward Lumbard, Senior United States Circuit Judge, Second Circuit, sitting by designation.

1. The Board's decision is reported at 1 BRBS 503.

er" whose responsibility was to check and record cargo as it was loaded onto or unloaded from vessels, barges, or containers. A container is a large metal box capable of carrying large amounts of cargo destined for one or more consignees. When a container carried goods for several different consignees, it would have to be unloaded or "stripped" and the goods would be sorted. Blundo, while recording cargo stripped from a container, was injured when he slipped on some ice on the pier. On the day of his injury Caputo was helping consignee's truckmen load their trucks with cargo. Caputo sustained his injury while rolling a dolly full of cargo into the consignee's truck.

The Supreme Court began its analysis with an extensive review of the legislative history of the LHWCA in general and of the 1972 amendments in particular. According to the Court, Congress, in amending the Act in 1972, had two concerns in mind: (1) "to adapt the LHWCA to modern cargo handling techniques, . . . specifically . . . the impact of containerization," and (2) "to provide continuous coverage throughout their employment to these amphibious workers who, without the amendments, would be covered for only part of their activity." At 273, 97 S.Ct. at 2362.

The Supreme Court found that Congress, by broadening the definition of the geographical boundaries of coverage and by amending the definition of the class of persons covered, "changed what had been essentially only a 'situs' test of eligibility for compensation to one looking to both the 'situs' of the injury and the 'status' of the injured." At 264–265, 97 S.Ct. at 2358. Applying this "situs-status" test, the Court found that Blundo's and Caputo's injuries

were sustained within the broadened geographical area of coverage and that their job assignments were within the modernized category of "longshoring operations."

Our task here is to determine the proper application of the "situs-status" test to the facts of this case, bearing in mind the dominant themes of the 1972 amendments. This undertaking is not a simple one since Powell's job, unlike the two jobs involved in *Northeast Marine Terminal,* does not neatly fit either of the two criteria that the Court recognized.

Turning first to the "situs" requirement, we believe there can be little doubt that Powell's injury was within the geographic boundaries of the employer's marine terminal. Powell's injury, like Caputo's, was sustained in the terminal area, which, at least in part, was used in loading and unloading ships. That is sufficient to satisfy the "situs" requirement, as defined by the Court in *Northeast Marine Terminal.*

▮▮▮ We now turn to the more difficult question whether Powell has satisfied the "status" requirement. Powell might well have been occupationally classified as a longshoreman for seventeen years, but here we must look to his employment status at the time of the accident.[2] As noted above, Powell was employed by a grain merchant to unload railroad cars transporting grain from inland points. He had worked in this position for about seven months at the time of the accident. After being unloaded, the grain was weighed, and then usually was stored for varying periods of time before being loaded aboard ship.[3]

The Supreme Court noted that "when Congress said it wanted to cover 'longshore-

---

**2.** Similarly, it is not relevant that Powell is a registered member of the International Longshoremen's and Warehousemen's Union, or that he worked in virtually all phases of the longshoring operation for every employer in the Port of Portland. We cannot concern ourselves with the entire span of a claimant's career.

**3.** It is also not relevant that a ship may have been in the process of being loaded by the stevedores at the time of the accident. Wheth-

er or not a ship was being loaded could have had no effect on the nature of Powell's duties. His responsibilities only involved unloading the grain from the rail cars to be conveyed to the scales. Whether the grain then went to storage bins, to ships, or to carriers for inland shipment was not a concern of Powell's. Indeed, this point serves to reinforce the view that Powell's duties involved only nonmaritime work.

men' it had in mind persons whose employment is such that they spend at least some of their time in indisputably longshoring operations." At 273, 97 S.Ct. at 2362. The Court found that Caputo was such a person by focusing on the fact that he could have been assigned to any one of a number of tasks throughout a *single workday* and that to deny coverage for one task while including coverage for another "would be to revitalize the shifting and fortuitous coverage that Congress intended to eliminate." *Id.*

■ In the past it might have been customary for Powell to hire himself out to employers on an irregular basis, and some of his work may have been indisputably maritime. At the time of the accident, however, Powell had been employed by the same employer performing the same duties for about seven months. Not once during that tenure was he called on to assist directly in the loading or unloading of any ship, nor is there any evidence that such genuine maritime work was even contemplated. Powell's attention was directed to the unloading of rail cars as they arrived at the elevator. He had no involvement whatsoever with the loading and unloading of the ships themselves. His work was more oriented to the rails than to the sea.

The policy pointed to by the Supreme Court in *Northeast Narine Terminal* to explain Congress's extension of the Act to employees who spend a part of their workday in nonmaritime activity cannot support coverage for Powell. Having served seven months of continuous, nonmaritime employment, with no indication that termination of that employment was contemplated, Powell cannot now claim that he is subject to the "shifting and fortuitous coverage" in a single workday that concerned the Supreme Court in Northeast Marine Terminal.[4]

We grant the petition for review, and remand for reinstatement of the decision of the administrative law judge denying benefits to the employee.

## J. BLAINE ANDERSON, dissenting:

In finding that Powell was not covered by the Act, the majority focuses upon his employment status at the time of the accident and concludes that his activities were "more oriented to the rails than to the sea." Believing that Powell's status at the time of the accident was identical to Caputo's in the overall process of loading and unloading, although performed at different ends of the spectrum, I respectfully dissent.

It should be noted that in *Northeast Marine Terminal, supra,* the Supreme Court, by focusing on the fact that Caputo could have been assigned to any one of a number of "longshoring" tasks on the day of his injury, did not have to decide the issue before this panel, i. e., whether Caputo's specific unloading task was covered under the Act. However, in my opinion, the Court indicated that that part of Caputo's job would be covered, even if the other tasks performed were not indisputably longshoring operations.

First of all, the Court rejected the point of rest theory as too restrictive. From this it is clear that coverage, in the case of loading, is extended beyond the point where the stevedoring operation begins and the terminal operation ends. The Court also reiterated the only example of work, found in the legislative history that Congress intended to exclude—employees "whose responsibility is only to pick up stored cargo for further trans-shipment." At 275, n. 37, 97 S.Ct. at 2363. The Court found that this example did not refer to Caputo, but is limited to "workers such as the consignee's truck drivers Caputo was helping, whose presence at the pier or terminal is for the purpose of picking up cargo for further shipment by land transportation." At 274–

---

4. This is not to say that an employee whose duties shifted from the maritime to the nonmaritime over a period of time greater than a single workday is never covered by LHWCA. We only note that in *Northeast Marine Terminal, supra,* the Supreme Court focused on an employee whose duties shifted throughout a single working day. We do not decide whether an employee whose duties shifted every week, or every month, may still qualify under the Act. That determination must be left to development in future cases.

275, n. 37, 97 S.Ct. at 2363. By analogy to Caputo's job, this example does not pertain to Powell. The purpose of Powell's presence at the terminal was not that of delivering cargo for further shipment by sea, but rather to initiate the process whereby this delivered cargo was loaded onto a ship.[1] Powell's function was identical to Caputo's in the overall process of loading and unloading, with the only difference being that their jobs were performed at different ends of the spectrum.

I am also persuaded by the fact that the Supreme Court repeatedly noted that the Act should be liberally construed, both because the language "engaged in maritime employment" is broad, and because the Act is remedial legislation. The Court noted that this broad language "suggests that we should take an expansive view of the extended coverage" since "such a construction is appropriate for this remedial legislation." At 268, 97 S.Ct. at 2359. I believe that a liberal construction supports the Board's finding "that the claimant's duties of unloading grain . . . was the beginning step of a longshoring operation in maritime employment." I believe that to hold otherwise would be to return to the "hop-scotch" effect that the 1972 amendments were designed to eliminate.

The Petition for Review should be denied.

---

**1.** The majority also finds that it is irrelevant that a ship may have been in the process of being loaded at the time of the accident. There was circumstantial evidence that at the time of Powell's injury, a ship was present and being loaded. Mr. Powell testified as follows:

"Q. Mr. Powell, do you know whether or not there was a vessel there at the time of your injury?

A. Well, I thought there was one there. I'm not sure. I'm not going to—I mean—.

Q. It doesn't make any difference to you?

A. As I say, at the time I thought there was a ship there because, if it wasn't there—I mean, the older guys would have been down there working the tipper and stuff like that, and like I say, I was towards the tail end of the layoff deal." (R.T. 34).

I also note that this evidence stands unrebutted by Cargill, even though it was within its power by its own records to demonstrate the reliability or unreliability of Powell's assertion. Accepting Powell's unrebutted version, though somewhat equivocal, I would conclude that some of his activities, like Caputo's in *Northeast Marine Terminal, infra*, were indisputably "longshoring operations," i. e., loading a ship even though his activity was confined to land. It was the beginning point of loading in the same sense that Caputo's activities were the ending point of unloading. To put it another way, could this ship have been loaded if no one had performed Powell's function?