**OILFIELD SAFETY AND MACHINE SPECIALTIES, INC. and The Aetna Casualty and Surety Company, Petitioners,**

v.

**HARMAN UNLIMITED, INC., Gray & Company, Inc. Charles Hansen and Director, Office of Workers' Compensation Programs, U. S. Department of Labor, Respondents.**

**HARMAN UNLIMITED, INC. and Gray & Company, Inc., Petitioners,**

v.

**OILFIELD SAFETY, INC., Aetna Casualty & Surety Company, Charles Hansen and Director, Office of Workers' Compensation Programs, U. S. Department of Labor, Respondents.**

Nos. 79–1145, 79–1211.

United States Court of Appeals, Fifth Circuit.

Sept. 18, 1980.

Bailey & Leininger, B. Ralph Bailey, Metairie, La., for petitioners in No. 79–1211.

Henderson, Hanemann & Morris, Charles J. Hanemann, Houma, La., for Oilfield Safety, Inc. and Aetna Cas. & Sur. Co.

Barron M. Whipple, Houma, La., for Charles Hansen.

Catherine A. Giacona, U.S. Dept. of Labor, Washington, D.C., for Director, O.W.C.P.

Before GOLDBERG, TATE and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

When confronted with two women, each claiming to be the mother of a small child, King Solomon ordered the child cut in two, with one half to be given to each mother. Upon hearing his decree, one of the women insisted that the child be given to her competitor. King Solomon recognized that only the true mother would concede her child in order to save its life, and he ordered the young baby given to its rightful parent. In the case at bar, this Court faces exactly the reverse situation. Charles Hansen was injured while making a safety inspection of an oil drilling platform in the Gulf of Mexico. Hansen's two employers, Oilfield Safety, Inc., and Harman Unlimited, Inc., each denied being his employer at the time of the injury and instead pointed their finger at the other party. The Administrative Law Judge (ALJ) and the Benefits Review Board (Board) held that both Oilfield Safety and Harman Unlimited were Hansen's employers at the time of the accident, and that both were jointly and severally liable for his worker's compensation benefits under the Longshoremen's and Harbor Workers' Compensation Act, (LHWCA). Additionally, the ALJ and the Board awarded

attorney's fees to Hansen's counsel. Both employers appeal. We affirm.

I. *Facts*

On November 2, 1976, while making a safety inspection of an oil drilling platform owned by Amoco Production Company, Clarence Hansen fell through a hole in the main platform and landed on the lower deck fifty feet below.[1] As a result of this fall, Hansen suffered multiple fractures of the left ankle, right leg, right elbow and wrist, and five cervical vertebrae. He subsequently filed for compensation benefits pursuant to the LHWCA. Oilfield Safety and Harman Unlimited immediately began paying compensation benefits. A hearing was held before the ALJ to determine, not whether Hansen was entitled to compensation, for that was undisputed, but rather whether Oilfield Safety, Inc. or Harman Unlimited, Inc. was Hansen's employer. The ALJ found that at the time of the injury both Oilfield Safety and Harman Unlimited were Hansen's employers. The ALJ awarded Hansen temporary total disability compensation from November 3, 1976, continuing medical costs and services, interest, and attorney's fees. He also decreed that Oilfield Safety and Harman Unlimited were to be jointly and severally liable.

Both Oilfield Safety and Harman Unlimited appealed to the Board. Each contended that Hansen was an employee of the other or, in the alternative, that Hansen was an independent contractor. They both also argued that the ALJ erred in holding them liable for attorney's fees; that such fees, if proper, were excessive; and that the ALJ improperly excluded certain evidence. The Board affirmed the ALJ's decision. Oilfield Safety and Harman Unlimited then instituted this appeal.[2]

1. The drilling platform was located in the Gulf of Mexico in an area covered by the Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1331 *et seq.* That Act provides that the LHWCA shall govern injuries occurring as a result of operations conducted on the Outer Continental Shelf. 43 U.S.C.A. § 1333(b) (Supp.1980).

2. Both Oilfield Safety and Harman Unlimited are now defunct. This appeal is being prosecuted by Aetna Casualty and Surety Co., Oilfield Safety's insurance carrier, and Gray & Co., Harman Unlimited's insurance carrier. For simplicity's sake, we will continue to refer to the parties as Oilfield Safety and Harman Unlimited.

While Hansen was pursuing his worker's compensation claim, he also filed suit against Amoco Production Company and Texaco, Inc. in federal district court to recover for the injuries sustained as a result of the November 2nd fall. Harman Unlimited intervened in the lawsuit to recover from Hansen an amount equal to the compensation and medical expenditures it had made to Hansen. On December 19, 1979, while this appeal was pending, Hansen settled his civil action with Amoco Production and Texaco for $650,000. Two days prior to settlement Hansen and Harman Unlimited resolved the third party action. Hansen agreed to reimburse Harman Unlimited for all compensation and medical expenditures made as a result of the accident. The agreement also provided that if this Court should hold Oilfield Safety was Hansen's sole employer at the time of the accident, then Hansen and Harman Unlimited would share on an equal basis any reimbursement due from Oilfield Safety to Harman Unlimited. On the other hand, Hansen and Harman Unlimited agreed that Harman Unlimited would be solely responsible for reimbursement due to Oilfield Safety if this Court should hold that Harman Unlimited was the sole employer at the time of the accident. After the December 19th settlement Hansen paid Harman Unlimited approximately $41,000, an amount equal to Harman Unlimited's compensation and medical expenditures at that time.

## II. *Mootness*

The first issue before this Court is whether Harman Unlimited's appeal is now moot. Oilfield Safety filed a pre-argument motion contending that Harman Unlimited's appeal is moot and should be dismissed. Oilfield Safety argues that since Hansen fully reimbursed Harman Unlimited for all payments made by Harman Unlimited pursuant to the LHWCA, Harman Unlimited now has suffered no loss. Oilfield Safety insists that Harman Unlimited no longer has a live controversy.

We disagree with Oilfield Safety's contention. The agreement between Harman Unlimited and Clarence Hansen provides that Harman Unlimited is to receive one-half of any reimbursement obtained from Oilfield Safety *if this Court should find that Oilfield Safety was Hansen's sole employer.* A prerequisite to a finding that Oilfield Safety was Hansen's sole employer is a holding that Harman Unlimited was not Hansen's employer. Harman Unlimited has an interest in a reversal of the Board's holding that it was one of Hansen's employers. Harman Unlimited's appeal is not moot and Oilfield Safety's Motion to Dismiss is denied.

## III. *The Merits*

The central issue on appeal is whether an employee-employer relationship existed between Clarence Hansen and Harman Unlimited, Oilfield Safety, or both. Harman Unlimited and Oilfield Safety contend that the Board erred in holding Hansen was their employee. In order to resolve this dispute this Court must first determine the standard for deciding whether an individual is an employee. Second, we must decide whether the Board correctly held that the ALJ's finding of dual employment is supported by substantial evidence on the record as a whole and is in accordance with the law. Finally, if both Harman Unlimited and Oilfield Safety are found to have been Hansen's employers at the time of the injury, this Court must determine which of them is liable.

### A. The Appropriate Standard

The initial step in resolving the employment question is to ascertain the standard to be applied in deciding whether an individual is an employee. Surprisingly, this is a question of first impression in this Circuit. All prior litigation in this Circuit has involved the question of whether an employee is covered by the LHWCA. *See, e. g., Odom Construction Co., Inc. v. United States Department of Labor,* 622 F.2d 110 (5th Cir. 1980); *Alabama Dry Dock and Shipbuilding Co. v. Kininess,* 554 F.2d 176 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977). This Court has

not yet had an opportunity to set forth a test to be used in determining the existence of an employee-employer relationship under the LHWCA.

Both Oilfield Safety and Harman Unlimited urge that this Court adopt the "right to control" test. They contend that only if a party has the right to control the details of another's work does an employee-employer relationship exist. Two other courts that have considered this issue have adopted this standard. *Cardillo v. Mockabee*, 102 F.2d 620 (D.C. Cir. 1939); *Yellow Cab Co. v. Magruder*, 49 F.Supp. 605 (D.Md.1943), affirmed 141 F.2d 324 (4th Cir. 1944). Both the ALJ and the Board used the "relative nature of the work" test. That test requires examining the nature of a claimant's work and the relation of that work to an employer's regular business. In deciding which test should be incorporated into LHWCA jurisprudence, this Court must examine the background and policies underlying the two standards. The test that best promotes the purposes and policies of the LHWCA should be used in determining the existence of an employer-employee relationship.

■ The "right to control" test comes from common law. It serves one main function in common law: to limit the scope of an employer's vicarious tort liability. 1C A. Larson, *Workmen's Compensation Law* § 43.42 (1980). Within the context of *respondeat superior* the focus on control is proper, because only if an employer controlled the details of an employee's work should the employer be liable for the employee's negligence. The principles underlying worker's compensation, however, are completely different from those that animate *respondeat superior*.

The theory of compensation legislation is that the cost of all industrial accidents should be borne by the consumer as part of the cost of the product. It follows that any worker whose services form a regular and continuing part of the cost of that product, and whose method of operation is not such an independent business that it forms in itself a separate route

through which his own cost of industrial accidents can be channeled, is within the presumptive area of intended protection. *Id.* at § 43.51. In short, the basic purpose for which the employee-employer relationship is used in compensation law is completely different from the basic purpose for which that relationship is used in the doctrine of *respondeat superior*. In the area of worker's compensation, the employee-employer test should be inclusive. *Cf. Northeast Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). In resolving whether employees satisfied the "status" test of the LHWCA, the Supreme Court noted that the 1972 Amendments are broad and suggest taking an expansive view of coverage. The right to control test tends to exclude, and thus is inappropriate for the LHWCA.

■ The test that best suits the principles of the LHWCA is the one applied by the ALJ and the Board, the relative nature of the work test. In determining the existence of an employee-employer relationship pursuant to this test, one examines the nature of the claimant's work in relation to the regular business of the employer. This examination must focus on two distinct areas: the nature of the claimant's work and the relation of that work to the alleged employer's regular business. In evaluating the character of a claimant's work, a court should focus on various factors, including the skill required to do the work, the degree to which the work constitutes a separate calling or enterprise, and the extent to which the work might be expected to carry its own accident burden. *Id.* at § 43.52. In analyzing the relationship of the claimant's work to the employer's business the factors to be examined include, among others, whether the claimant's work is a regular part of the employer's regular work, whether the claimant's work is continuous or intermittent, and whether the duration of claimant's work is sufficient to amount to the hiring of continuing services as distinguished from the contracting for the completion of a particular job. *Id.*

The adoption of the relative nature of the work test is in accordance with the basic principles set forth by the Supreme Court in *Cardillo v. Liberty Mutual Insurance Co.*, 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947), and by this Court in *Gaudet v. Exxon Corp.*, 562 F.2d 351 (5th Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1979). *Cardillo v. Liberty Mutual* involved a related issue—whether an employee killed while driving to work in a company encouraged car pool was injured during the course of employment. The Supreme Court refused to apply rigid common-law legal principles in determining whether the injury occurred during the course of employment.

[T]o import all the common law concepts of control and erect them as the sole or prime guide for the Deputy Commissioner in cases of this nature would be to encumber his duties with all the technicalities and unrealities which have marked the use of those concepts in other fields.

330 U.S. at 481, 67 S.Ct. at 808. The Supreme Court concluded that the profound changes in employer-employee relationships had diminished the applicability of the common-law master-servant doctrines in the workers' compensation area.

This Circuit expressed a similar concern in *Gaudet v. Exxon Corp.* *Gaudet* involved the use of the common-law borrowed employee doctrine to extend the coverage of the LHWCA. This Court applied the traditional borrowed employee test, with its emphasis on control. In doing so we noted that, "[i]n many cases, as in the instant one, the traditional test yields conclusions valid in the LHWCA context, *but [the] doctrine should not be applied blindly, especially in circumstances in which it did not evolve.*" *Gaudet*, 562 F.2d at 357 (emphasis added). Today this Court, by adopting the relative nature of the work test, adheres to the basic notions set forth in *Cardillo* and *Gaudet.*

■ This is not to say that the various factors composing the right to control test are irrelevant. The factors should be used in determining the existence of an employ-ee-employer relationship. Indeed, in many cases, the traditional right to control test will produce a result that is appropriate in the LHWCA context. There will be cases, however, where the right to control test simply produces an inappropriate conclusion. Given the nature of the LHWCA and workers' compensation statutes in general, this Court holds that the proper test to be used in determining whether an employer-employee relationship exists is the relative nature of the work test.

B. The Employment Relationship with Oilfield Services

■ The ALJ and the Board found that Hansen was an employee of Oilfield Services. These findings of fact may be reversed only if they are not supported by substantial evidence. *Banks v. Chicago Grain Trimmers Association*, 390 U.S. 459, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968). In reviewing administrative findings, this Court must not substitute its judgment for that of the agency. *Watson v. Gulf Stevedore Corp.*, 400 F.2d 649 (5th Cir. 1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1471, 22 L.Ed.2d 755 (1969). Where substantial evidence supports the factual findings and the findings are not arbitrary, this Court must affirm the judgment of the ALJ or Benefits Review Board. *Tampa Ship Repair and Dry Dock Co. v. Director*, 535 F.2d 936 (5th Cir. 1976).

The evidence offered at the hearing before the ALJ established that Hansen was a one-half owner of Oilfield Services. His job entailed obtaining contracts and performing safety inspections on behalf of Oilfield Safety. On October 30, 1976, Hansen went offshore to an Amoco Production oilfield complex to conduct safety inspections. On that trip he wore coveralls bearing the Oilfield Safety emblem. The helicopter pilot responsible for transporting Hansen to the offshore rigs logged him in as an employee of Oilfield Safety. On November 2, the date of the accident, Michael Brien, the other half-owner of Oilfield Safety, went to the hospital and admitted Hansen as an employee of Oilfield Safety. On December

6, 1976, over one month after the injury, Oilfield Safety paid Hansen $550 for salary. Finally, and perhaps most importantly, Hansen testified at the hearing that, on the date of his injury, he was doing safety inspection work for Oilfield Safety.

Oilfield Safety introduced evidence at the hearing to show that Hansen was not an employee. Oilfield Safety established that it did not control the details of Hansen's work nor could it order Hansen off the Amoco platform. Oilfield Safety pointed out that there was not a written employment contract with Hansen and that Hansen did not undergo a physical examination prior to starting work with Oilfield Safety. Finally, Michael Brien testified that, prior to the accident, he and Hansen agreed to and terminated Hansen's ties with Oilfield Safety. Oilfield Safety argues forcefully that Harman Unlimited was Hansen's employer. Oilfield Safety points out that Hansen admitted he began trying the obtain business for Harman Unlimited in early October 1976. The company also points to the fact that the meal and bunk registers for Amoco Production's oil rig list Hansen as an employee of Harman Unlimited.

■ There is undoubtedly conflicting evidence about the existence of an employee-employer relationship between Oilfield Safety and Clarence Hansen. This Court, however, is unable to say that the finding that an employment relationship existed in unreasonable. *See Abilene Sheet Metal, Inc. v. National Labor Relations Board,* 619 F.2d 332 (5th Cir. 1980). Since substantial evidence supports this finding of the ALJ and the Board, their holding is affirmed.

### C. The Employment Relationship with Harman Unlimited

Billy Harman was vice president and chief executive officer of Harman Unlimited, a firm whose primary business was furnishing welding and sandblasting services. The record indicates that in early October 1976, Billy Harman contacted Clarence Hansen and sought help from Hansen in obtaining new business for Harman Unlimited. Hansen agreed to do what he could for Harman Unlimited. In return, Billy Harman agreed to pay Hansen an unspecified commission for any new work that Hansen brought into the office. During the month of October Hansen contacted several companies on behalf of Harman Unlimited and was instrumental in getting Harman Unlimited included on Amoco Production's approved list of contractors. When Hansen went offshore in late October to conduct the safety inspections on the Amoco Production oil rigs, he continued to promote Harman Unlimited. While on the offshore platforms he distributed Harman Unlimited cards and literature. His efforts on behalf of Harman Unlimited were apparently quite extensive, since Amoco Production's platform foreman listed Hansen as an employee of Harman Unlimited on the meal and bunk rosters, in the production reports, and on the accident report.

Harman Unlimited offered evidence to show that there was no employment relationship. Harman Unlimited established that it had absolutely no control over Clarence Hansen's activities and that it furnished him no equipment. There was no written employment contract, no specified compensation rate, and no payments were ever made to Hansen. Its major contention is that Hansen was actually an employee of Oilfield Safety. It points out that Hansen was on Oilfield Safety's payroll, that Oilfield Safety handled his tax withholdings, that Hansen worked out of Oilfield Safety's offices, gave Oilfield Safety as his business address, gave Oilfield Safety's telephone number as the location where he could be reached, drove an Oilfield Safety Automobile, and was paid by Oilfield Safety. Harman Unlimited argues that Hansen was an employee of Oilfield Safety and, at best, had an independent contractor relationship with it.

■ Once again, there is conflicting evidence about the existence of an employment relationship. Indeed, an analysis of the relationship under the common-law right to control test might lead to the conclusion that Hansen was not an employee of Harman Unlimited. An examination of the

relationship pursuant to the relative nature of the work test, however, convinces us that the ALJ and Benefits Review Board did not err in holding that Hansen was a Harman Unlimited employee. In October 1976 Harman Unlimited was in dire financial straights. Billy Harman, the executive officer, turned to Clarence Hansen, an individual he knew would be able to obtain business for Harman Unlimited. He asked Clarence Hansen to use his contacts in the oil industry to promote Harman Unlimited and attract new customers. The nature of such a job virtually prohibits a supervisor from controlling the details of the work. That does not mean, however, that there should not be an employment relationship for the purposes of the LHWCA. Promotional activities were certainly a regular part of Harman Unlimited's business and had to be continuous in nature in order to ensure financial success. Further, this Court is unwilling to characterize Hansen's salesmanship as a separate calling typically expected to carry its own accident burden. There is substantial evidence to support the finding that the nature of Clarence Hansen's work in relation to the regular business of Harman Unlimited made him an employee.

### D. Liability

There is substantial evidence to support the finding that Hansen was an employee of both Oilfield Safety and Harman Unlimited. This Court must now distribute the liability between the two employers. There are two possible approaches for assessing liability in dual employment situations. The first is to hold liable the employer for whom the employee was working at the moment when the employee was injured. In the case at bar the undisputed evidence establishes that the injury occurred when Hansen was walking to pick up equipment used in the safety inspection. This first approach would place the full burden of liability on Oilfield Safety. The second approach, the one taken by the ALJ and the

Board, is to hold the employers jointly and severally liable. Adoption of this test would result in the affirmance of the order issued by the Benefits Review Board.

 Congress designed the LHWCA to provide injured employees with certain and absolute benefits instead of potential common-law benefits obtainable only via tort actions against the employer. *Gaudet v. Exxon Corporation*, 562 F.2d 351 (5th Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1979). This structure is best served by a rule holding dual employers jointly and severally liable for compensable injuries incurred by employees. If the rule were otherwise, an employee's compensation would undoubtedly be delayed in many instances while the employers, not unreasonably, dissected his actions to determine for whom the employee was working at the exact moment the accident occurred. Holding dual employers jointly and severally liable guarantees that an injured employee will not go without compensation benefits while the employers battle to determine which is liable. We affirm the order of the Benefits Review Board holding Oilfield Safety and Harman Unlimited jointly and severally liable for compensation benefits.

### IV. *Attorney's Fees*

Immediately after the injury Oilfield Safety and Harman Unlimited began paying Clarence Hansen weekly disability benefits. (They paid these benefits under an arrangement with the deputy commissioner which provided that the payments would not prejudice their right to litigate the question of employment.) At the formal hearing before the ALJ Oilfield Safety and Harman Unlimited raised the issue of employment. The only issued raised by Hansen at the hearing was his right to medical expenses. Both the ALJ and the Board awarded attorney's fees to Clarence Hansen against Oilfield Safety and Harman Unlimited. Oilfield Safety [3] contends that the Board erred in making this award.

**3.** Harman Unlimited challenged the ALJ's award of attorney's fees before the Benefits Review Board, but does not raise the issue before this court.

Under the LHWCA, attorney's fees may be awarded "[i]f the employer or carrier *declines to pay any compensation . . . and the person seeking benefits shall thereafter have utilized the services of an attorney at law in the successful prosecution of his claim . . . ." 33 U.S.C. § 928(a) (emphasis added). Oilfield Safety notes that the LHWCA distinguishes sharply between "medical services and supplies," referred to in 33 U.S.C. § 907, and "compensation for disability," referred to in 33 U.S.C. § 908. "Medical services" and "compensation" are terms of art it argues, with totally different meanings. Oilfield Safety contends that since it did not decline to pay *compensation*, but only medical benefits, the Board erred in awarding claimant attorney's fees. We disagree.

Initially, this Court must dispel the notion that Congress used "compensation" as a term of art in the LHWCA. An examination of two of the Act's sections illustrates the fallacy of this argument. Section 904(a) provides "[e]very employer shall be liable for and shall secure the payment to his employees of the *compensation* payable under *Sections 907*, 908, and 909 of this Title." 33 U.S.C. § 904(a) (emphasis added). Section 906(a), which deals with the time for commencement of compensation, provides "no *compensation* shall be allowed for the first three days of the disability, *except the benefits provided for in Section 907 . . . ." 33 U.S.C. § 906(a) (emphasis added). Section 907 of the LHWCA, however, *deals exclusively with medical services and supplies*. These statutory provisions demonstrate that Congress used the term "compensation" on several occasions in a fashion encompassing medical expenses. A literal reading of Section 928(a) provides little assistance in resolving the attorney's fees question before this Court.

The legislative history of Section 928 also fails to directly address this issue. The House and Senate Reports do not indicate whether Congress intended for medical expenses to be considered "compensation" for the purposes of Section 928. *See* H.R.Rep. No. 1441, 92d Cong. 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 4698, 4706; S.Rep. No. 1125, 92d Cong., 2d Sess. (1972). The policies underlying Section 928(a), however, indicate that Congress did intend for attorney's fees to be awarded where the dispute centered solely on the provision of medical services. First, Section 928(a) is designed to ensure that an employee will recover the full amount of his statutory benefits. It provides for assessing attorney's fees against an employer when the employer denies liability for compensation and the employee utilizes legal counsel to successfully prosecute the claim. This provision ensures that an employee will not have to reach into the statutory benefits to pay for legal services, thus diminishing the ultimate recovery. This protection applies equally to monetary compensation and medical benefits. There is no reason to believe that Congress intended for the employer to bear attorney's fees when monetary compensation is at issue, but for the employee to pay for his own legal fees when the issue is medical services.

Second, Section 928(a) provides an incentive for employers to pay claims rather than contest them. That incentive consists of assessing attorney's fees against the employer when the employer denies a legitimate claim and the employee uses the services of an attorney to obtain his statutory benefits. This incentive also applies equally to monetary compensation and medical benefits. It is best promoted by considering medical services to be a component of the term "compensation" in Section 928(a).

One final factor argues strongly for affirming the Board's order. Courts must give great weight to the statutory constructions developed by administrative bodies with an expertise in the area of law. *See Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 97 S.Ct. 576, 50 L.Ed.2d 494 (1977). The Benefits Review Board has consistently held that for the purposes of Section 928(a), payment of medical expenses constitutes payment of compensation. *See, e. g., Dolge v. Navy*

**1258**

*Resale System Office*, 7 BRBS 967, 971 (1978); *Simeone v. Universal Terminal and Stevedoring Corp.*, 5 BRBS 249, 252 (1976). In light of the policies underlying Section 928 and the consistent construction accorded that section by the Benefits Review Board, this Court affirms the award of attorney's fees.

V. *Conclusion*

Harman Unlimited's appeal is not moot and Oilfield Safety's motion to dismiss is denied. There is substantial evidence to support the ALJ and Board's finding that Hansen was an employee of both Harman Unlimited and Oilfield Safety. The employers must jointly and severally bear liability. Finally, the Board did not err in assessing attorney's fees in the case at bar. The Board's final order is affirmed.

AFFIRMED; MOTION TO DISMISS IN NO. 79–1211 DENIED.