933 F.2d 256
 1991 A.M.C. 2775
 ZAPATA HAYNIE CORPORATION, Aetna Casualty & Surety Company,
Petitioners,
v.
George G. BARNARD, II, Director, Office of Workers'
Compensation Programs, United States Department of
Labor, Respondents.
 No. 90-2135.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 4, 1991.
Decided May 21, 1991.
 
 William S. Sands, Jr., White, Johnson & Lawrence, Norfolk, Va., for petitioners.
 
 
 1
 Alan William Clarke, Clarke & Clarke, Kilmarnock, Va., for Respondent Barnard.
 
 
 2
 Michael Scott Hertzig, argued (Robert P. Davis, Sol. of Labor, Carol A. De Deo, Associate Sol., Janet R. Dunlop, Longshore, Office of Sol., U.S. Dept. of Labor, Washington, D.C., on brief), for respondent Director.
 
 
 3
 Before RUSSELL, Circuit Judge, HILL, Senior Circuit Judge for the Eleventh Circuit, sitting by designation, and WARD, Senior District Judge for the Middle District of North Carolina, sitting by designation.
 
 HIRAM H. WARD, Senior District Judge:
 
 4
 Petitioners Zapata Haynie Corporation and Aetna Casualty & Surety Company appeal from an award of benefits to respondent George G. Barnard, II, under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. Secs. 901, et seq. The Director, Office of Worker's Compensation Programs, United States Department of Labor, is also named as a respondent. We affirm.
 
 
 5
 * Barnard was an aircraft pilot fish spotter for Zapata in Virginia from 1981 to 1984, when he was grounded by an FAA medical examiner after suffering from a major depressive illness. Zapata is in the business of catching and processing menhaden, a common non-food fish used for fish meal and oil. It operates a large fleet of fishing boats which work from the Carolinas to Massachusetts.
 
 
 6
 Barnard was hired in 1981 to work as a fish spotter at Zapata's facility in Reedville, Virginia. From 1981 to 1983, Barnard flew out of the airport at Hummel, Virginia. In 1984, he was transferred to the Norfolk area to fly over the lower portions of Chesapeake Bay out of Norfolk Airport. It was this move and the resulting stress caused by flying out of this congested area which apparently triggered Barnard's illness. Barnard testified that he was involved in several near-misses in the immediate Norfolk area, some including military aircraft.[1] In addition to these mishaps, Barnard suffered stress from flying long hours in heavily controlled and crowded airspace.[2] He also testified to having arguments with fishing vessel captains.
 
 
 7
 Menhaden were originally spotted from the crow's nest of fishing vessels. As radio communications improved, together with the advent of efficient aircraft, the duties of fish spotting were eventually transferred to airborne spotters. The fish spotters are not connected to any one boat, but work as a unit and direct several boats. A spotter will work with several boats in one day. The spotter's bonus is not based upon the catch of one boat, but upon the catch for the entire company. The job involves flying over navigable waters and directing the boats to the fish, estimating the number of fish, and then guiding the boats in encircling the fish with a purse net. The job requires knowledge of tides and sea conditions, as well as a knowledge of fishing and loading. It was Barnard's inability to make decisions on one occasion concerning the shipboard loading of the menhaden which led to his grounding.
 
 
 8
 After his grounding, Barnard continued to have mental and emotional problems. Zapata and Aetna insurance denied Barnard's claim for benefits under the LHWCA.[3] Barnard then brought his case before an Administrative Law Judge, who, in May 1987, ruled that Barnard was a covered employee and was entitled to temporary total disability and medical benefits under the LHWCA, which he then began receiving. Zapata appealed to the Benefits Review Board (the "Board") which affirmed the ALJ. This appeal followed.
 
 II
 
 9
 The sole question of law presented on appeal is whether the LHWCA covers an airplane pilot fish spotter who suffers an injury while flying over navigable waters.[4] This court reviews decisions of the Board to see whether there was substantial evidence in the record to support the Board's decision. 33 U.S.C. Sec. 921(b)(3); Newport News Shipbuilding & Dry Dock Co. v. Tann, 841 F.2d 540, 543 (4th Cir.1988). We also determine whether the Board's decisions are contrary to law. The Board's adjudicatory interpretation of the LHWCA is entitled to no special deference, and is subject to our independent review. See Potomac Electric Power Co. v. Director, OWCP, 449 U.S. 268, 279 n. 18, 101 S.Ct. 509, 515 n. 18, 66 L.Ed.2d 446 (1980). However, a reasonable interpretation of the LHWCA by the Director should be respected. In this case, the Director's interpretation adopts and is in agreement with the Board's finding of coverage. Because the Director administers and enforces the LHWCA, this court defers to his interpretation unless it is unreasonable or contrary to Congressional intent. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); Newport News Shipbuilding and Dry Dock Co. v. Howard, 904 F.2d 206 (4th Cir.1990).[5] It does not appear that the Director's interpretation, and thereby the Board's, is contrary to Congressional intent, nor does it appear that it is an unreasonable one. Therefore, we affirm.
 
 
 10
 * The first question presented is whether Congress has addressed the issue currently before the court. If Congressional intent is clear, this court may not impose its own views upon an unambiguous Congressional mandate. Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82; Howard, 904 F.2d at 209. In this case, the statutes at issue, 33 U.S.C. Sec. 902(3) and 33 U.S.C. Sec. 903(a), do not, on their face, dispose of the question presented. Rather, it is the application of these statutes which is at issue. In light of the case law surrounding interpretation of the terms involved under the LHWCA, we hold that the Board's ruling below cannot be said to go against clear Congressional direction. In fact, the parties themselves seem to recognize this conclusion as this point is not directly briefed. Therefore, we move on to the second question: whether the Director's interpretation of the LHWCA is a reasonable and permissible construction of the above statutes. Chevron, 467 U.S. at 843, 104 S.Ct. at 2782; Howard, 904 F.2d at 209.
 
 B
 
 11
 In order to be covered under the LHWCA, a claimant must satisfy both a geographical situs and an occupational status test. Prior to 1972, if a claimant worked for a covered employer, only a situs requirement was necessary. Prior to 1972, section 903(a) extended coverage to employees of statutory employers only if they sustained an injury "occurring upon the navigable waters of the United States." 33 U.S.C. Sec. 903(a), Act of 1927. Partly because employees, during the course of a day, were moving in and out of coverage as they performed their duties, Congress amended the LHWCA in 1972 by adding an occupational status requirement. Thus, certain employees, depending upon whether they were engaged in "maritime employment," would be covered regardless of whether the injury actually occurred upon the water. See Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). In 1983, the Supreme Court held that in enacting the 1972 amendments, Congress did not intend to withdraw coverage from any employee who was actually injured upon navigable waters. Therefore, when a worker is injured there, he meets the situs and status requirements and is covered under the LHWCA. Director, OWCP v. Perini North River Associates, 459 U.S. 297, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983).
 
 
 12
 Because Zapata does not contest that it is a statutory employer, the first question is whether Barnard would have fallen within the pre-1972 coverage of the Act. If so, the inquiry ends. If not, Barnard must satisfy both the status and situs requirements in order to be covered. The second issue Zapata raises is whether Barnard would be excluded from coverage due to the operation of the exclusions covering aquaculture workers and members of the crew of any vessel. 33 U.S.C. Sec. 902(3)(E), (G).
 
 
 13
 The Director argues, as the Board below held, that there was coverage because Barnard's injury occurred over, and therefore on, navigable waters. Therefore, because he was engaged in "traditional maritime employment," he would have been covered under the Act before the 1972 amendments. In reaching this conclusion, the Board relied on Ward v. Director, OWCP, 684 F.2d 1114 (5th Cir.1982), cert. denied, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1013 (1983), which held that a fish spotter who was killed when his plane crashed into the Gulf of Mexico and who regularly flew over navigable waters in the course of his employment was covered as he met both the status and situs requirements. We agree with the Director that Ward is analogous to this case.
 
 
 14
 Zapata argues that Ward has been limited by subsequent Supreme Court decisions, especially Herb's Welding, Inc. v. Gray, 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985), and Chesapeake and Ohio Ry. Co. v. Schwalb, 493 U.S. 40, 110 S.Ct. 381, 107 L.Ed.2d 278 (1989). In Herb's Welding, a welder who was injured while working on an oil rig was not covered by the LHWCA. The Court there held that there was nothing inherently maritime about welding and that the employee merely happened to be injured while in a marine environment. In Herb's Welding and Schwalb, the Court stated that "land-based activity [on the situs] will be deemed maritime only if it is an essential part of loading or unloading a vessel." Schwalb, 110 S.Ct. at 384.
 
 
 15
 However, these cases are distinguishable. First, Barnard's activities as a fish spotter were not land-based activities. Unlike the employees in Herb's Welding and Schwalb, Barnard's duties required him to work over navigable waters at all times except for taking off and landing. Indeed, in Herb's Welding, the Court expressly stated that its holding "[did] not preclude benefits for those whose injury would have been covered before 1972 because it occurred 'on navigable waters.' " 470 U.S. at 424, n. 10, 105 S.Ct. at 1428, n. 10.[6]
 
 
 16
 Likewise, Zapata's distinction that Ward is inapplicable because Barnard did not actually come in contact with the water was also correctly rejected below. Barnard was regularly engaged in the course of his duties over navigable waters and not merely fortuitously over water when his injury occurred. To draw a distinction between actually making contact with the water and simply working above it would be hypertechnical and contrary to the liberal construction of the LHWCA. We see nothing unreasonable in these interpretations and adopt the Director's reasoning in holding that Barnard's injury occurred while "upon navigable waters."
 
 
 17
 Zapata further argues that fish spotting is not a traditional maritime activity, and therefore would not be covered under the LHWCA prior to 1972. It seems clear, however, that fish spotting was traditionally an activity inherent to commercial fishing. The ALJ heard testimony from a commercial menhaden fishing expert who testified that, traditionally, crewmen would climb to the crow's nests of fishing vessels to spot fish. This activity had been done on schooners and later steamboats. Airborne spotting remained largely ineffective until after World War II. The Director and the Board, after considering the history of fish spotting, reasonably rejected Zapata's argument.
 
 III
 
 18
 Lastly, Zapata argues that Barnard falls within either the aquaculture exception to coverage, section 2(3)(E), or within the crew member exception to coverage, section 2(3)(G). The Board found that Barnard clearly was not a member of the crew of a vessel, even though fish spotters used to be crewmembers when they performed their duties aboard ship. Barnard, as an airborne fish spotter, was not on board a vessel. Nor is an aircraft a vessel within the meaning of the LHWCA. Barnard was not attached to any particular vessel. Instead, he worked with many different ships. This fact mitigates against a finding that he was a crewmember in its traditional sense. Zapata's argument here was also rejected in Ward as well as in subsequent interpretations by the Board. We see no reason to disturb the Director's interpretation, as it seems manifestly reasonable.
 
 
 19
 20 C.F.R. Sec. 701.301(a)(12)(iii)(E) (1990) provides that aquaculture workers are "those employed by commercial enterprises involved in the controlled cultivation and harvest of aquatic plants and animals, including the cleaning, processing or canning of fish and fish products." Clearly, the Director posits, Barnard does not fit into this exclusion. We agree. First, menhaden fishing is itself not a controlled cultivation or harvest. Second, Barnard was not involved with any processing of the caught fish.
 
 
 20
 Fish spotting seems to be a traditionally maritime activity, not a land-based one transplanted to a maritime location. It also seems clear that Barnard's injury occurred while upon navigable waters. Finally, a plain reading of the statute and regulations, not to mention the developed case law, shows that Barnard would not fall within the aquaculture or crew member exceptions of the LHWCA. We find nothing unreasonable in the Director's interpretation of coverage under the LHWCA. Accordingly, we affirm the Board's decision below awarding benefits and adopt the Director's interpretation that coverage exists in this case.
 
 
 21
 AFFIRMED.
 
 
 
 [1]
 In one instance, Barnard had just landed at Norfolk when a Navy jet landed in the opposite direction on the same runway. Apparently the Navy jet had been cleared to land, but at another airport. Barnard just missed the jet on the ground
 
 
 [2]
 Contributing to Barnard's stress was the fact that he had to monitor three radio frequencies in addition to Norfolk control in order to communicate with the boats and the other fish spotters as well as eavesdrop on the competition
 
 
 [3]
 Barnard's illness, chronic stress disorder, was diagnosed in November 1984. His claim is governed by the 1984 amendments to the coverage requirements of the LHWCA, 33 U.S.C. Secs. 902, 903, which became effective September 28, 1984
 
 
 [4]
 Coverage is the only issue contested. Apparently Zapata does not dispute the conclusion that Barnard's injury would be covered if coverage exists
 
 
 [5]
 We decline to adhere to Zapata's argument in this case that this court should not defer to the Director's construction of a jurisdictional rather than a purely administrative or policy-making issue
 
 
 [6]
 Even if fish spotting was a land-based activity, which it clearly is not, the nature of Barnard's duties did involve the loading of the boats, as it was the fish spotter who directed the boats in their loading operations at sea