35 F.3d 122
 PITTMAN MECHANICAL CONTRACTORS, INCORPORATED, Petitioner,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, United
States Department of Labor; Michael T. Simonds,
Respondents.
 No. 93-2096.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 6, 1994.
Decided Sept. 13, 1994.
 
 ARGUED: Mark Steven Davis, McGuire, Woods, Battle & Boothe, Norfolk, VA, for petitioner. Robert Elliott Walsh, Rutter & Montagna, Norfolk, VA, for respondent Simonds; Joshua T. Gillelan, II, Office of the Solicitor, U.S. Dept. of Labor, Washington, DC, for respondent Director. ON BRIEF: Robert W. McFarland, McGuire, Woods, Battle & Boothe, Norfolk, VA, for petitioner. Thomas S. Williamson, Jr., Solicitor of Labor, Carol A. De Deo, Associate Solicitor, Office of the Solicitor, U.S. Dept. of Labor, Washington, DC, for respondent Director.
 Before RUSSELL and WILLIAMS, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 Affirmed by published opinion. Judge WILLIAMS wrote the opinion, in which Judge RUSSELL and Senior Judge BUTZNER joined.
 OPINION
 WILLIAMS, Circuit Judge:
 
 
 1
 Michael T. Simonds filed a claim for disability benefits under the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. Secs. 901-950 (1988), alleging that he sustained a back injury while working as a pipe welder for Pittman Mechanical Contractors, Inc. (Pittman). After a hearing, an administrative law judge (ALJ) awarded benefits, and the Benefits Review Board (Board) affirmed the ALJ's order. Pittman filed a petition for review, claiming that Simonds was not engaged in "maritime employment," and, therefore, was not a covered employee under the LHWCA, and that Simonds' injury was not a result of his employment with Pittman. We find that Simonds is indeed a covered employee under the LHWCA, and that substantial evidence supports the Board's finding that Simonds' injury arose out of his employment with Pittman. Consequently, we affirm.
 
 I.
 
 2
 Respondent Simonds was employed by Pittman as a pipe welder from April 27, 1988, to January 31, 1989.[1] During October and November 1988, he was assigned to a project on Pier 12 at the Norfolk, Virginia Naval Operations Base, in which Pittman contracted to construct pipelines for the pier. The project involved removing the old pipelines and replacing them with new pipelines. The pipelines are used to load fuel, steam, and water onto the vessels when they are docked at the pier.[2]
 
 
 3
 Simonds' primary task was to weld each pipe section which was contained in a concrete trough that measured four feet by four feet. The pipe was positioned six to eight inches off the ground so that a welder had to straddle the pipe and bend over a mirror placed under the pipe in order to see where to weld. The welding position was particularly awkward for Simonds due to his height of 6' 4".
 
 
 4
 Sometime in November 1988, Simonds developed back problems. On January 10, 1989, he was seen by Dr. Richard S. Wright, a chiropractor, for lower back and leg pain and stiffness. Dr. Wright recorded in his notes that the onset of Simonds' pain occurred two months earlier and that it was caused by "welding pipe for a long period of time" while in an awkward position. (J.A. at 142.) Dr. Wright took X-rays which showed a compressed fifth lumbar disc, and he diagnosed acute lumbosacral sprain. Dr. Wright advised Simonds to discontinue work as it was aggravating his condition, and he continued to treat Simonds until April 18, 1989.
 
 
 5
 Simonds stopped working for Pittman on January 31, 1989, and for the next six months worked as a welder for two other companies. Although he worked as many as seventy hours per week, he frequently took time off to rest his back. As a result of his injury and the ensuing back pain, Simonds consulted two orthopaedic physicians in August 1989, and stopped working from August 1, 1989, until July 1990. An MRI showed central disc herniation and dislocation, and a laminectomy diskectomy was performed in November 1989. By January 1990, Simonds was allowed to return to work only in a "light duty position," but not as a welder. (J.A. at 209.) Simonds worked as a line cook at a restaurant beginning in July 1990, and earned an average of $144.83 per week.
 
 
 6
 Simonds filed a claim for disability benefits under the LHWCA on January 15, 1990, alleging that he sustained his injury while working for Pittman on the Pier 12 project in November 1988. Pittman denied disability benefits on the ground that Simonds was not a covered employee under the LHWCA. On November 21, 1990, a formal hearing was held before ALJ Richard K. Malamphy. A Decision and Order was issued on April 10, 1991, in which the ALJ determined that Simonds' work on Pier 12 was "maritime employment" and that his condition was related to his employment by Pittman at Pier 12. Therefore, the ALJ granted Simonds temporary total disability benefits of $489.31 per week from August 1, 1989, through July 9, 1990, and temporary partial disability benefits of $392.77 per week thereafter during the continuation of the disability, but not to exceed five years.[3] On July 29, 1993, the Benefits Review Board affirmed the ALJ's decision in a published opinion. Simonds v. Pittman Mechanical Contractors, Inc., 27 B.R.B.S. 120 (1993); (J.A. at 229.) Pittman brought a timely petition for review of that disposition to this court.
 
 II.
 
 7
 "The Board's adjudicatory interpretation of the LHWCA is entitled to no special deference, and is subject to our independent review." Zapata Haynie Corp. v. Barnard, 933 F.2d 256, 258 (4th Cir.1991). However, absent clear congressional intent to the contrary, we do afford deference to a reasonable construction of the LHWCA by the Director, Office of Workers' Compensation Programs (Director), because he has policymaking authority with regard to the Act. Weyher/Livsey Constructors, Inc. v. Prevetire, 27 F.3d 985, 987 (4th Cir. 1994); see also DOWCP v. Newport News Shipbuilding & Dry Dock Co., 8 F.3d 175, 179 (4th Cir.1993) ("Absent clear congressional intent as to the proper construction of the LHWCA, we must give deference to the Director's reasonable and permissible interpretation."); Barnard, 933 F.2d at 258 ("Because the Director administers and enforces the LHWCA, this court defers to his interpretation unless it is unreasonable or contrary to Congressional intent."). Here, the Director's construction, as reflected in his brief submitted to the court in this case, is in accordance with the decisions by the ALJ and the Board. Because we find this interpretation to be reasonable, supported by law, and not contrary to congressional intent, we defer to that interpretation and, accordingly, affirm the Board's order awarding benefits.
 
 
 8
 In order to be covered under the LHWCA, an employee must satisfy both a "situs" and a "status" requirement. Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 265, 279, 97 S.Ct. 2348, 2358, 2365, 53 L.Ed.2d 320 (1977). To meet the "situs" test, an employee's injuries must occur "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)." 33 U.S.C. Sec. 903(a) (1988). Here, Pittman concedes that Simonds' injury on Pier 12 meets the "situs" requirement.
 
 
 9
 To satisfy the "status" requirement, a person must be "engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, [or be a] harbor-worker including a ship repairman, shipbuilder, and ship-breaker...." 33 U.S.C. Sec. 902(3) (1988).[4] We must decide whether Simonds was engaged in maritime employment within the meaning of the statute. It is widely held that, aside from the occupations specifically enumerated in Sec. 902(3), land-based activity is considered maritime employment only if it is an "integral or essential part of loading or unloading a vessel." Chesapeake & Ohio Ry. Co. v. Schwalb, 493 U.S. 40, 45, 110 S.Ct. 381, 384, 107 L.Ed.2d 278 (1989); see also Prevetire, 27 F.3d 985, 989; Etheridge v. Norfolk & W. Ry. Co., 9 F.3d 1087, 1089 (4th Cir.1993).
 
 
 10
 Pittman's contention that Simonds' duties as a welder were not maritime employment is two-fold. First, because his tasks did not directly involve the loading or unloading of a vessel, Simonds was, at most, servicing a pipeline conduit through which steam, water, and fuel traveled from the navy base to the dock for future transfer and use on the ships, not directly to the ships. Second, Pittman argues that there is an implicit requirement that the items loaded or unloaded be cargo, not mere ship supplies such as steam, water, and fuel.
 
 
 11
 We agree with the Director that Simonds was engaged in maritime employment. In Schwalb, 493 U.S. at 47, 110 S.Ct. at 385, the Court stated:
 
 
 12
 [E]mployees who are injured while maintaining or repairing equipment essential to the loading or unloading process are covered by the Act. Such employees are engaged in activity that is an integral part of and essential to those overall processes. That is all that Sec. 902(3) requires.... Someone who repairs or maintains a piece of loading equipment is just as vital to and an integral part of the loading process as the operator of the equipment.
 
 
 13
 Moreover, in Herb's Welding Inc. v. Gray, 470 U.S. 414, 420, 105 S.Ct. 1421, 1425, 84 L.Ed.2d 406 (1985), the Court, when discussing congressional intent behind the 1972 amendments to the LHWCA, stated, "[t]he most important of Congress' concerns ... was the desire to extend coverage to ... [those] who were injured while on piers, docks, and other areas customarily used to load and unload ships...." We also note that Sec. 902(3) is to be "liberally construed to favor coverage under the LHWCA." Prevetire, 27 F.3d 985, 988; see also Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 268, 97 S.Ct. 2348, 2359, 53 L.Ed.2d 320 (1977).
 
 
 14
 It is true that this court has ruled that a pipe fitter engaged in the construction of a power plant at a naval shipyard, intended ultimately to produce the electricity necessary for the operation of equipment needed for shipbuilding and ship-repair operations, was not engaged in maritime employment. Prevetire, 27 F.3d 985, 989. That tenuated connection with maritime status precluded any finding that the claimant in that case was involved in the "repair[ ] or [maintenance of] equipment used in the loading or unloading process." Id. In the instant case, Simonds was injured while installing and repairing pipelines that transported steam, water, and fuel--supplies essential to the operation of the vessel--from the land-based storage facilities over a pier and onto the docked ships. The necessity of these items is demonstrated by the fact that Pier 12 could not be used for docking purposes while the pipelines were out of commission. The transported steam and water were necessary for the ships' proper operation, while the fuel was required for the operation of the aircraft contained on board the carriers. Absent other means of transport, the pipelines serviced by Simonds were the only available method to load the supplies essential to the ships' operation. Hence, Simonds was actually engaged in the installation and repair of equipment necessary for the loading process and, thereby, in maritime employment.
 
 
 15
 Pittman also argues that Simonds was not engaged in maritime employment because the pipelines did not convey cargo. It relies on Munguia v. Chevron U.S.A. Inc., 999 F.2d 808, 813 n. 8 (5th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1839, 128 L.Ed.2d 466 (1994), in which the Fifth Circuit stated that "the loading and unloading test for 'maritime employment' [encompasses] at least an implicit requirement that what is loaded be 'cargo' [i.e. freight]." We reject this contention. This circuit has interpreted and applied the term "maritime employment" numerous times and, while work covered by the LHWCA must be an essential part of the loading or unloading of a vessel, we have never limited that definition to cargo. As stated above, we have liberally construed the definition of maritime employment to allow for coverage under the LHWCA. The adoption of an implicit "cargo" requirement, without any statutory or judicial support for such a prerequisite, would be contrary to this policy and a disservice to the LHWCA. Moreover, the loading of supplies such as steam, water, and fuel, which are necessary to the functioning of the vessels and their transport of cargo, cannot rationally be distinguished from cargo itself. The Director expressly repudiates the Fifth Circuit's "cargo" interpretation and, because his view is reasonable, supported by law, and not contrary to congressional intent, we reject Pittman's contention.
 
 
 16
 Accordingly, we find that Simonds was engaged in maritime employment, and, therefore, was covered under the LHWCA.III.
 
 
 17
 Pittman also argues that Simonds failed to prove that his injury arose out of his employment with Pittman. The Board determined that there was substantial evidence in the record to support the ALJ's findings of injury causation. 33 U.S.C. Sec. 921(b)(3) (1988). We review the Board's decision for errors of law and to determine whether the Board properly adhered to the statutorily-mandated "substantial evidence" standard in affirming the ALJ's factual findings. See DOWCP v. Newport News Shipbuilding & Dry Dock Co., 8 F.3d at 179; Munguia, 999 F.2d at 810. We note that it is the duty of the ALJ to determine the credibility of witnesses and to ascribe weight to their testimony. "[T]he ALJ's findings may not be disregarded on the basis that other inferences might have been more reasonable. Deference must be given the fact-finder's inferences and credibility assessments, and we have emphasized the scope of review of ALJ findings is limited." Newport News Shipbuilding & Dry Dock Co. v. Tann, 841 F.2d 540, 543 (4th Cir.1988). Under this deferential standard, we affirm the Board's decision that there is substantial evidence to support the ALJ's finding that Simonds' injury "ar[ose] out of and in the course of [his] employment" at Pittman, while working on Pier 12 in November 1988. 33 U.S.C. Sec. 902(2) (1988).
 
 
 18
 The evidence established that Simonds first sought treatment for his back injury in January 1989, while he was still working for Pittman. Dr. Wright, Simonds' chiropractor, examined Simonds in January 1989. He noted, as part of Simonds' patient history, that the back and leg pain was caused by welding pipes two months earlier, and recommended that Simonds discontinue work because it exacerbated his condition. In addition, the ALJ accepted the testimony of Daryl Higgins, the foreman of Simonds' crew, regarding the onset of Simonds' injury while working for Pittman. Higgins recalled that sometime in November 1988, someone screamed at the Pier 12 worksite. Upon investigation, Higgins discovered Simonds in the trough, unable to stand up. When Higgins asked what had happened, Simonds said, "I just snapped my back." (J.A. at 71.) Higgins further testified that Simonds continued to complain about his back but, because Simonds did not go to a doctor at the time, Higgins did not file an accident report. However, Higgins did recall reporting the incident to the general foreman.
 
 
 19
 Pittman points out conflicting testimony regarding the origin of Simonds' injury, as well as discrepancies in Simonds' medical records. For instance, Simonds did not provide written notice of his injury to Pittman, and continued to work for Pittman through January 1989 and after that time worked elsewhere as a welder. The ALJ, however, accepted Simonds' testimony that he did not realize the severity of the injury when it occurred in November 1988. As stated above, we must pay deference to the ALJ's credibility assessments and the weight given the testimony by the ALJ. Accordingly, we reject Pittman's contentions and find that there is sufficient evidence to support the ALJ's finding that Simonds' injury occurred during his employment with Pittman.
 
 IV.
 
 20
 For the foregoing reasons, we affirm the Board's order.
 
 
 21
 AFFIRMED.
 
 
 
 [1]
 Simonds was previously employed by Pittman, but his first job with the company is unconnected to this appeal
 
 
 [2]
 The pier was used primarily for aircraft carriers, and the fuel lines carried JP-5 fuel, or jet petroleum, which is loaded on the carriers and used by the aircraft
 
 
 [3]
 A person with a temporary total disability is entitled to compensation at the rate of two-thirds his average weekly wages. 33 U.S.C. Sec. 908(b) (1988). Compensation for a temporary partial disability is two-thirds of the difference between the injured employee's average weekly wages before the injury and his wage earning capacity after the injury. 33 U.S.C. Sec. 908(e) (1988)
 Pittman claims error in the ALJ's determination of Simonds' disability benefits. First, it points to the fact that the ALJ corrected Simonds' attorney's error in arithmetic concerning Simonds' compensation. Pittman cites no authority in support of its contention, and we find this claim to be meritless.
 Pittman also contends that the ALJ erred in computing Simonds' preinjury average weekly wages, because the figures were based on Simonds' higher than normal wages as a welder for Pittman rather than his true earnings history. However, "the average weekly wage of the injured employee at the time of the injury shall be taken as the basis upon which to compute compensation...." 33 U.S.C. Sec. 910 (1988) (emphasis added). Therefore, we find this claim to be without merit.
 
 
 [4]
 Section 902(3) enumerates several exceptions to the term "employee" under the LHWCA, but none are relevant in this action